# TURNER BROADCASTING SYSTEM, INC., ET AL. *v.* FEDERAL COMMUNICATIONS COMMISSION ET AL.

No. 93–44.  Argued January 12, 1994—Decided June 27, 1994

624

Kennedy, J., announced the judgment of the Court and delivered the opinion for a unanimous Court with respect to Part I, the opinion of the Court with respect to Parts II–A and II–B, in which Rehnquist, C. J., and Blackmun, O'Connor, Scalia, Souter, Thomas, and Ginsburg, JJ., joined, the opinion of the Court with respect to Parts II–C, II–D, and III–A, in which Rehnquist, C. J., and Blackmun, Stevens, and Souter,

JJ., joined, and an opinion with respect to Part III–B, in which REHN-QUIST, C. J., and BLACKMUN and SOUTER, JJ., joined. BLACKMUN, J., filed a concurring opinion, *post*, p. 669. STEVENS, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 669. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which SCALIA and GINSBURG, JJ., joined, and in Parts I and III of which THOMAS, J., joined, *post*, p. 674. GINSBURG, J., filed an opinion concurring in part and dissenting in part, *post*, p. 685.

*H. Bartow Farr III* argued the cause for appellants. With him on the briefs for appellant National Cable Television Association, Inc., were *Joel I. Klein* and *Richard G. Taranto. Bruce D. Sokler, Peter Kimm, Jr., Gregory A. Lewis, Mary Ann Zimmer, Christopher Fager, Bruce D. Collins,* and *Neal S. Grabell* filed a brief for appellants Turner Broadcasting System, Inc., et al. *John P. Cole, Jr.,* and *Kenneth Farabee* filed a brief for appellant Daniels Cablevision, Inc. *Albert G. Lauber, Jr., Peter Van N. Lockwood, Dorothy L. Foley, Judith A. McHale,* and *Barbara S. Wellbery* filed a brief for appellants Discovery Communications, Inc., et al. *Robert D. Joffe, Stuart W. Gold, Edward J. Weiss, Brian Conboy,* and *Theodore Case Whitehouse* filed a brief for appellant Time Warner Entertainment Co.

*Solicitor General Days* argued the cause for appellees. With him on the brief for the federal appellees were *Assistant Attorney General Hunger, Deputy Solicitor General Wallace, Christopher J. Wright, Douglas N. Letter, Bruce G. Forrest,* and *Jonathan R. Siegel. Mark H. Lynch, Richard W. Buchanan, Marilyn Mohrman-Gillis, Paula A. Jameson,* and *Nancy Howell Hendry* filed a brief for appellees Association of America's Public Television Stations et al. *Rex E. Lee, Carter G. Phillips, Robert A. Beizer, Mark D. Hopson,* and *James J. Popham* filed a brief for appellee Association of Independent Television Stations, Inc. *Angela J. Campbell, Elliot M. Mincberg, Andrew Jay Schwartzman,* and *Gigi B. Sohn* filed a brief for appellees Consumer Federation of America et al. *Bruce J. Ennis, Jr., David W. Ogden, Donald B. Verrilli, Jr., Ann M. Kappler, Nory*

*Miller, Benjamin F. P. Ivins, Jack N. Goodman,* and *Kathleen M. Sullivan* filed a brief for appellee National Association of Broadcasters.*

JUSTICE KENNEDY announced the judgment of the Court and delivered the opinion of the Court, except as to Part III–B.

Sections 4 and 5 of the Cable Television Consumer Protection and Competition Act of 1992 require cable television systems to devote a portion of their channels to the transmission of local broadcast television stations. This case presents the question whether these provisions abridge the freedom of speech or of the press, in violation of the First Amendment.

The United States District Court for the District of Columbia granted summary judgment for the United States,

---

*Briefs of *amici curiae* urging reversal were filed for the Courtroom Television Network by *Floyd Abrams;* for the Media Institute by *Sol Schildhause;* for the New Inspirational Network by *James S. Blitz;* and for the United States Telephone Association et al. by *Laurence H. Tribe, Jonathan S. Massey, Michael W. McConnell, Kenneth S. Geller, Kenneth W. Starr, Paul T. Cappuccio, Michael K. Kellogg, Mark L. Evans, James R. Young, John Thorne, Robert A. Levetown, Gerald E. Murray, Liam S. Coonan, Thomas P. Hester, Walter H. Alford, William B. Barfield,* and *Richard W. Odgers.*

Briefs of *amici curiae* urging affirmance were filed for the State of Connecticut by *Richard Blumenthal,* Attorney General, *William B. Gundling,* Associate Attorney General, and *Phillip Rosario,* Assistant Attorney General; for the City of Los Angeles et al. by *Larrine S. Holbrooke, Teresa D. Baer, James K. Hahn,* and *Edward J. Perez;* for the National Association of Telecommunications Officers and Advisors et al. by *Robert Alan Garrett* and *David Frohlich;* and for Telemundo Group, Inc., by *William S. Reyner, Jr.,* and *Marvin J. Diamond.*

Briefs of *amici curiae* were filed for the American Civil Liberties Union by *Burt Neuborne, Steven R. Shapiro, Marjorie Heins,* and *Arthur N. Eisenberg;* for the California Cable Television Association by *Frank W. Lloyd III;* for the Citizens for a Sound Economy Foundation by *Mark R. Paoletta;* and for DirecTv, Inc., et al. by *Lawrence R. Sidman* and *John B. Richards.*

holding that the challenged provisions are consistent with the First Amendment. Because issues of material fact remain unresolved in the record as developed thus far, we vacate the District Court's judgment and remand the case for further proceedings.

## I

## A

The role of cable television in the Nation's communications system has undergone dramatic change over the past 45 years. Given the pace of technological advancement and the increasing convergence between cable and other electronic media, the cable industry today stands at the center of an ongoing telecommunications revolution with still undefined potential to affect the way we communicate and develop our intellectual resources.

The earliest cable systems were built in the late 1940's to bring clear broadcast television signals to remote or mountainous communities. The purpose was not to replace broadcast television but to enhance it. See *United States* v. *Southwestern Cable Co.*, 392 U. S. 157, 161–164 (1968); D. Brenner, M. Price, & M. Meyerson, Cable Television and Other Nonbroadcast Video § 1.02 (1992); M. Hamburg, All About Cable, ch. 1 (1979). Modern cable systems do much more than enhance the reception of nearby broadcast television stations. With the capacity to carry dozens of channels and import distant programming signals via satellite or microwave relay, today's cable systems are in direct competition with over-the-air broadcasters as an independent source of television programming.

Broadcast and cable television are distinguished by the different technologies through which they reach viewers. Broadcast stations radiate electromagnetic signals from a central transmitting antenna. These signals can be captured, in turn, by any television set within the antenna's range. Cable systems, by contrast, rely upon a physical, point-to-

point connection between a transmission facility and the television sets of individual subscribers. Cable systems make this connection much like telephone companies, using cable or optical fibers strung aboveground or buried in ducts to reach the homes or businesses of subscribers. The construction of this physical infrastructure entails the use of public rights-of-way and easements and often results in the disruption of traffic on streets and other public property. As a result, the cable medium may depend for its very existence upon express permission from local governing authorities. See generally *Community Communications Co.* v. *Boulder*, 660 F. 2d 1370, 1377–1378 (CA10 1981).

Cable technology affords two principal benefits over broadcast. First, it eliminates the signal interference sometimes encountered in over-the-air broadcasting and thus gives viewers undistorted reception of broadcast stations. Second, it is capable of transmitting many more channels than are available through broadcasting, giving subscribers access to far greater programming variety. More than half of the cable systems in operation today have a capacity to carry between 30 and 53 channels. Television and Cable Factbook, Services Vol. No. 62, p. I–69 (1994). And about 40 percent of cable subscribers are served by systems with a capacity of more than 53 channels. *Ibid.* Newer systems can carry hundreds of channels, and many older systems are being upgraded with fiber optic rebuilds and digital compression technology to increase channel capacity. See, *e. g.,* Cablevision Systems Adds to Rapid Fiber Growth in Cable Systems, Communications Daily 6–7 (Feb. 26, 1993).

The cable television industry includes both cable operators (those who own the physical cable network and transmit the cable signal to the viewer) and cable programmers (those who produce television programs and sell or license them to cable operators). In some cases, cable operators have acquired ownership of cable programmers, and vice versa. Although cable operators may create some of their own pro-

gramming, most of their programming is drawn from outside sources. These outside sources include not only local or distant broadcast stations, but also the many national and regional cable programming networks that have emerged in recent years, such as CNN, MTV, ESPN, TNT, C–SPAN, The Family Channel, Nickelodeon, Arts and Entertainment, Black Entertainment Television, CourtTV, The Discovery Channel, American Movie Classics, Comedy Central, The Learning Channel, and The Weather Channel. Once the cable operator has selected the programming sources, the cable system functions, in essence, as a conduit for the speech of others, transmitting it on a continuous and unedited basis to subscribers. See Brenner, Cable Television and the Freedom of Expression, 1988 Duke L. J. 329, 339 ("For the most part, cable personnel do not review any of the material provided by cable networks. . . . [C]able systems have no consciontrol over program services provided by others").

In contrast to commercial broadcast stations, which transmit signals at no charge to viewers and generate revenues by selling time to advertisers, cable systems charge subscribers a monthly fee for the right to receive cable programming and rely to a lesser extent on advertising. In most instances, cable subscribers choose the stations they will receive by selecting among various plans, or "tiers," of cable service. In a typical offering, the basic tier consists of local broadcast stations plus a number of cable programming networks selected by the cable operator. For an additional cost, subscribers can obtain channels devoted to particular subjects or interests, such as recent-release feature movies, sports, children's programming, sexually explicit programming, and the like. Many cable systems also offer pay-per-view service, which allows an individual subscriber to order and pay a one-time fee to see a single movie or program at a set time of the day. See J. Goodale, All About Cable: Legal and Business Aspects of Cable and Pay Television § 5.05[2] (1989); Brenner, *supra*, at 334, n. 22.

## B

On October 5, 1992, Congress overrode a Presidential veto to enact the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. 102–385, 106 Stat. 1460 (1992 Cable Act or Act).  Among other things, the Act subjects the cable industry to rate regulation by the Federal Communications Commission (FCC) and by municipal franchising authorities; prohibits municipalities from awarding exclusive franchises to cable operators; imposes various restrictions on cable programmers that are affiliated with cable operators; and directs the FCC to develop and promulgate regulations imposing minimum technical standards for cable operators. At issue in this case is the constitutionality of the so-called must-carry provisions, contained in §§4 and 5 of the Act, which require cable operators to carry the signals of a specified number of local broadcast television stations.

Section 4 requires carriage of "local commercial television stations," defined to include all full power television broadcasters, other than those qualifying as "noncommercial educational" stations under §5, that operate within the same television market as the cable system.  §4, 47 U. S. C. §§534(b)(1)(B), (h)(1)(A) (1988 ed., Supp. IV).[1]  Cable systems with more than 12 active channels, and more than 300 subscribers, are required to set aside up to one-third of their channels for commercial broadcast stations that request carriage.  §534(b)(1)(B).  Cable systems with more than 300 subscribers, but only 12 or fewer active channels, must

---

[1] Although a cable system's local television market is defined by regulation, see 47 CFR §73.3555(d)(3)(i) (1993), the FCC is authorized to make special market determinations upon request to better effectuate the purposes of the Act.  See 1992 Cable Act §4, 47 U. S. C. §534(h)(1)(C) (1988 ed., Supp. IV).

carry the signals of three commercial broadcast stations. § 534(b)(1)(A).[2]

If there are fewer broadcasters requesting carriage than slots made available under the Act, the cable operator is obligated to carry only those broadcasters who make the request. If, however, there are more requesting broadcast stations than slots available, the cable operator is permitted to choose which of these stations it will carry. § 534(b)(2).[3] The broadcast signals carried under this provision must be transmitted on a continuous, uninterrupted basis, § 534(b)(3), and must be placed in the same numerical channel position as when broadcast over the air, § 534(b)(6). Further, subject to a few exceptions, a cable operator may not charge a fee for carrying broadcast signals in fulfillment of its must-carry obligations. § 534(b)(10).

Section 5 of the Act imposes similar requirements regarding the carriage of local public broadcast television stations,

---

[2] If there are not enough local full power commercial broadcast stations to fill the one-third allotment, a cable system with up to 35 active channels must carry one qualified low power station and an operator with more than 35 channels must carry two of them. See § 534(c)(1); see also § 534(h)(2) (defining "qualified low power station"). Low power television stations are small broadcast entities that transmit over a limited geographic range. They are licensed on a secondary basis and are permitted to operate only if they do not interfere with the signals of full power broadcast stations.

[3] Cable systems are not required to carry the signal of any local commercial television station that "substantially duplicates" the signal of any other broadcast station carried on the system. § 534(b)(5); see also In re Implementation of the Cable Television Consumer Protection and Competition Act of 1992 (Broadcast Signal Carriage Issues), No. 92–259, Mar. 29, 1993, ¶ 19 (defining "substantial duplication" as a 50 percent overlap in programming). Nor are they required to carry the signals of more than one station affiliated with each national broadcast network. If the cable operator does choose to carry broadcast stations with duplicative programming, however, the system is credited with those stations for purposes of its must-carry obligations. § 534(b)(5).

referred to in the Act as local "noncommercial educational television stations." 47 U. S. C. § 535(a) (1988 ed., Supp. IV).[4]   A cable system with 12 or fewer channels must carry one of these stations; a system of between 13 and 36 channels must carry between one and three; and a system with more than 36 channels must carry each local public broadcast station requesting carriage.   §§ 535(b)(2)(A), (b)(3)(A), (b)(3)(D). The Act requires a cable operator to import distant signals in certain circumstances but provides protection against substantial duplication of local noncommercial educational stations.   See §§ 535(b)(3)(B), (e).   As with commercial broadcast stations, § 5 requires cable system operators to carry the program schedule of the public broadcast station in its entirety and at its same over-the-air channel position. §§ 535(g)(1), (g)(5).

Taken together, therefore, §§ 4 and 5 subject all but the smallest cable systems nationwide to must-carry obligations, and confer must-carry privileges on all full power broadcasters operating within the same television market as a qualified cable system.

## C

Congress enacted the 1992 Cable Act after conducting three years of hearings on the structure and operation of the cable television industry.   See S. Rep. No. 102–92, pp. 3–4 (1991) (describing hearings); H. R. Rep. No. 102–628, p. 74 (1992) (same).   The conclusions Congress drew from its factfinding process are recited in the text of the Act itself.   See §§ 2(a)(1)–(21).   In brief, Congress found that the physical characteristics of cable transmission, compounded by the in-

---

[4] "Noncommercial educational television station[s]" are defined to include broadcast stations that are either (1) licensed by the FCC as a "noncommercial educational television broadcast station" and have, as licensees, entities which are eligible to receive grants from the Corporation for Public Broadcasting; or (2) owned and operated by a municipality and transmit "predominantly noncommercial programs for educational purposes."   §§ 535(*l*)(1)(A)–(B).

creasing concentration of economic power in the cable industry, are endangering the ability of over-the-air broadcast television stations to compete for a viewing audience and thus for necessary operating revenues. Congress determined that regulation of the market for video programming was necessary to correct this competitive imbalance.

In particular, Congress found that over 60 percent of the households with television sets subscribe to cable, § 2(a)(3), and for these households cable has replaced over-the-air broadcast television as the primary provider of video programming, § 2(a)(17). This is so, Congress found, because "[m]ost subscribers to cable television systems do not or cannot maintain antennas to receive broadcast television services, do not have input selector switches to convert from a cable to antenna reception system, or cannot otherwise receive broadcast television services." *Ibid.* In addition, Congress concluded that due to "local franchising requirements and the extraordinary expense of constructing more than one cable television system to serve a particular geographic area," the overwhelming majority of cable operators exercise a monopoly over cable service. § 2(a)(2). "The result," Congress determined, "is undue market power for the cable operator as compared to that of consumers and video programmers." *Ibid.*

According to Congress, this market position gives cable operators the power and the incentive to harm broadcast competitors. The power derives from the cable operator's ability, as owner of the transmission facility, to "terminate the retransmission of the broadcast signal, refuse to carry new signals, or reposition a broadcast signal to a disadvantageous channel position." § 2(a)(15). The incentive derives from the economic reality that "[c]able television systems and broadcast television stations increasingly compete for television advertising revenues." § 2(a)(14). By refusing carriage of broadcasters' signals, cable operators, as a practical matter, can reduce the number of households that have

access to the broadcasters' programming, and thereby capture advertising dollars that would otherwise go to broadcast stations. § 2(a)(15).

Congress found, in addition, that increased vertical integration in the cable industry is making it even harder for broadcasters to secure carriage on cable systems, because cable operators have a financial incentive to favor their affiliated programmers. § 2(a)(5). Congress also determined that the cable industry is characterized by horizontal concentration, with many cable operators sharing common ownership. This has resulted in greater "barriers to entry for new programmers and a reduction in the number of media voices available to consumers." § 2(a)(4).

In light of these technological and economic conditions, Congress concluded that unless cable operators are required to carry local broadcast stations, "[t]here is a substantial likelihood that . . . additional local broadcast signals will be deleted, repositioned, or not carried," § 2(a)(15); the "marked shift in market share" from broadcast to cable will continue to erode the advertising revenue base which sustains free local broadcast television, §§ 2(a)(13)–(14); and that, as a consequence, "the economic viability of free local broadcast television and its ability to originate quality local programming will be seriously jeopardized," § 2(a)(16).

## D

Soon after the Act became law, appellants filed these five consolidated actions in the United States District Court for the District of Columbia against the United States and the Federal Communications Commission (hereinafter referred to collectively as the Government), challenging the constitutionality of the must-carry provisions. Appellants, plaintiffs below, are numerous cable programmers and cable operators. After additional parties intervened, a three-judge District Court convened under 28 U. S. C. § 2284 to hear the actions. 1992 Cable Act § 23, 47 U. S. C. § 555(c)(1) (1988 ed., Supp.

IV). Each of the plaintiffs filed a motion for summary judgment; several intervenor-defendants filed cross-motions for summary judgment; and the Government filed a cross-motion to dismiss. Although the Government had not asked for summary judgment, the District Court, in a divided opinion, granted summary judgment in favor of the Government and the other intervenor-defendants, ruling that the must-carry provisions are consistent with the First Amendment. 819 F. Supp. 32 (1993).

The court found that in enacting the must-carry provisions, Congress employed "its regulatory powers over the economy to impose order upon a market in dysfunction." *Id.*, at 40. The court characterized the 1992 Cable Act as "simply industry-specific antitrust and fair trade practice regulatory legislation," *ibid.*, and said that the must-carry requirements "are essentially economic regulation designed to create competitive balance in the video industry as a whole, and to redress the effects of cable operators' anti-competitive practices," *ibid.* The court rejected appellants' contention that the must-carry requirements warrant strict scrutiny as a content-based regulation, concluding that both the commercial and public broadcast provisions "are, in intent as well as form, unrelated (in all but the most recondite sense) to the content of any messages that [the] cable operators, broadcasters, and programmers have in contemplation to deliver." *Ibid.* The court proceeded to sustain the must-carry provisions under the intermediate standard of scrutiny set forth in *United States* v. *O'Brien*, 391 U. S. 367 (1968), concluding that the preservation of local broadcasting is an important governmental interest, and that the must-carry provisions are sufficiently tailored to serve that interest. 819 F. Supp., at 45–47.

Judge Williams dissented. He acknowledged the "very real problem" that "cable systems control access 'bottlenecks' to an important communications medium," *id.*, at 57, but concluded that Congress may not address that problem

by extending access rights only to broadcast television stations. In his view, the must-carry rules are content based, and thus subject to strict scrutiny, because they require cable operators to carry speech they might otherwise choose to exclude, and because Congress' decision to grant favorable access to broadcast programmers rested "in part, but quite explicitly, on a finding about their content." *Id.,* at 58. Applying strict scrutiny, Judge Williams determined that the interests advanced in support of the law are inadequate to justify it. While assuming "as an abstract matter" that the interest in preserving access to free television is compelling, he found "no evidence that this access is in jeopardy." *Id.,* at 62. Likewise, he concluded that the rules are insufficiently tailored to the asserted interest in programming diversity because cable operators "now carry the vast majority of local stations," and thus to the extent the rules have any effect at all, "it will be only to replace the mix chosen by cablecasters—whose livelihoods depend largely on satisfying audience demand—with a mix derived from congressional dictate." *Id.,* at 61.

This direct appeal followed, see § 23, 47 U. S. C. § 555(c)(1) (1988 ed., Supp. IV), and we noted probable jurisdiction. 509 U. S. 952 (1993).

## II

There can be no disagreement on an initial premise: Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment. *Leathers* v. *Medlock,* 499 U. S. 439, 444 (1991). Through "original programming or by exercising editorial discretion over which stations or programs to include in its repertoire," cable programmers and operators "see[k] to communicate messages on a wide variety of topics and in a wide variety of formats." *Los Angeles* v. *Preferred Communications, Inc.,* 476 U. S. 488, 494 (1986). By requiring cable systems to set aside a portion of their channels for local broadcasters,

the must-carry rules regulate cable speech in two respects:
The rules reduce the number of channels over which cable
operators exercise unfettered control, and they render it
more difficult for cable programmers to compete for carriage
on the limited channels remaining. Nevertheless, because
not every interference with speech triggers the same degree
of scrutiny under the First Amendment, we must decide at
the outset the level of scrutiny applicable to the must-carry
provisions.

## A

We address first the Government's contention that regula-
tion of cable television should be analyzed under the same
First Amendment standard that applies to regulation of
broadcast television. It is true that our cases have permit-
ted more intrusive regulation of broadcast speakers than of
speakers in other media. Compare *Red Lion Broadcasting
Co.* v. *FCC*, 395 U. S. 367 (1969) (television), and *National
Broadcasting Co.* v. *United States*, 319 U. S. 190 (1943)
(radio), with *Miami Herald Publishing Co.* v. *Tornillo*, 418
U. S. 241 (1974) (print), and *Riley* v. *National Federation of
Blind of N. C., Inc.*, 487 U. S. 781 (1988) (personal solicita-
tion). But the rationale for applying a less rigorous stand-
ard of First Amendment scrutiny to broadcast regulation,
whatever its validity in the cases elaborating it, does not
apply in the context of cable regulation.

The justification for our distinct approach to broadcast
regulation rests upon the unique physical limitations of the
broadcast medium. See *FCC* v. *League of Women Voters of
Cal.*, 468 U. S. 364, 377 (1984); *Red Lion, supra,* at 388–389,
396–399; *National Broadcasting Co.,* 319 U. S., at 226. As a
general matter, there are more would-be broadcasters than
frequencies available in the electromagnetic spectrum. And
if two broadcasters were to attempt to transmit over the
same frequency in the same locale, they would interfere with
one another's signals, so that neither could be heard at all.
*Id.,* at 212. The scarcity of broadcast frequencies thus re-

quired the establishment of some regulatory mechanism to divide the electromagnetic spectrum and assign specific frequencies to particular broadcasters. See *FCC* v. *League of Women Voters, supra,* at 377 ("The fundamental distinguishing characteristic of the new medium of broadcasting . . . is that [b]roadcast frequencies are a scarce resource [that] must be portioned out among applicants") (internal quotation marks omitted); *FCC* v. *National Citizens Comm. for Broadcasting,* 436 U. S. 775, 799 (1978). In addition, the inherent physical limitation on the number of speakers who may use the broadcast medium has been thought to require some adjustment in traditional First Amendment analysis to permit the Government to place limited content restraints, and impose certain affirmative obligations, on broadcast licensees. *Red Lion,* 395 U. S., at 390. As we said in *Red Lion,* "[w]here there are substantially more individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." *Id.,* at 388; see also *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 101 (1973).

Although courts and commentators have criticized the scarcity rationale since its inception,[5] we have declined to question its continuing validity as support for our broadcast jurisprudence, see *FCC* v. *League of Women Voters, supra,* at 376, n. 11, and see no reason to do so here. The broadcast

---

[5] See, *e. g., Telecommunications Research and Action Center* v. *FCC,* 801 F. 2d 501, 508–509 (CADC 1986), cert. denied, 482 U. S. 919 (1987); L. Bollinger, Images of a Free Press 87–90 (1991); L. Powe, American Broadcasting and the First Amendment 197–209 (1987); M. Spitzer, Seven Dirty Words and Six Other Stories 7–18 (1986); Note, The Message in the Medium: The First Amendment on the Information Superhighway, 107 Harv. L. Rev. 1062, 1072–1074 (1994); Winer, The Signal Cable Sends— Part I: Why Can't Cable Be More Like Broadcasting?, 46 Md. L. Rev. 212, 218–240 (1987); Coase, The Federal Communications Commission, 2 J. Law & Econ. 1, 12–27 (1959).

cases are inapposite in the present context because cable television does not suffer from the inherent limitations that characterize the broadcast medium. Indeed, given the rapid advances in fiber optics and digital compression technology, soon there may be no practical limitation on the number of speakers who may use the cable medium. Nor is there any danger of physical interference between two cable speakers attempting to share the same channel. In light of these fundamental technological differences between broadcast and cable transmission, application of the more relaxed standard of scrutiny adopted in *Red Lion* and the other broadcast cases is inapt when determining the First Amendment validity of cable regulation. See *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 74 (1983) ("Our decisions have recognized that the special interest of the Federal Government in regulation of the broadcast media does not readily translate into a justification for regulation of other means of communication") (footnote omitted).

This is not to say that the unique physical characteristics of cable transmission should be ignored when determining the constitutionality of regulations affecting cable speech. They should not. See *infra*, at 656. But whatever relevance these physical characteristics may have in the evaluation of particular cable regulations, they do not require the alteration of settled principles of our First Amendment jurisprudence.

Although the Government acknowledges the substantial technological differences between broadcast and cable, see Brief for Federal Appellees 22, it advances a second argument for application of the *Red Lion* framework to cable regulation. It asserts that the foundation of our broadcast jurisprudence is not the physical limitations of the electromagnetic spectrum, but rather the "market dysfunction" that characterizes the broadcast market. Because the cable market is beset by a similar dysfunction, the Government maintains, the *Red Lion* standard of review should also apply to

cable. While we agree that the cable market suffers certain structural impediments, the Government's argument is flawed in two respects. First, as discussed above, the special physical characteristics of broadcast transmission, not the economic characteristics of the broadcast market, are what underlies our broadcast jurisprudence. See *League of Women Voters*, 468 U. S., at 377; *National Citizens Comm. for Broadcasting, supra*, at 799; *Red Lion, supra*, at 390. Second, the mere assertion of dysfunction or failure in a speech market, without more, is not sufficient to shield a speech regulation from the First Amendment standards applicable to nonbroadcast media. See, *e. g., Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, 657–658 (1990); *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 256–259 (1986); *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S., at 248–258.

By a related course of reasoning, the Government and some appellees maintain that the must-carry provisions are nothing more than industry-specific antitrust legislation, and thus warrant rational-basis scrutiny under this Court's "precedents governing legislative efforts to correct market failure in a market whose commodity is speech," such as *Associated Press* v. *United States*, 326 U. S. 1 (1945), and *Lorain Journal Co.* v. *United States*, 342 U. S. 143 (1951). See Brief for Federal Appellees 17. This contention is unavailing. *Associated Press* and *Lorain Journal* both involved actions against members of the press brought under the Sherman Antitrust Act, a law of general application. But while the enforcement of a generally applicable law may or may not be subject to heightened scrutiny under the First Amendment, compare *Cohen* v. *Cowles Media Co.*, 501 U. S. 663, 670 (1991), with *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560, 566–567 (1991), laws that single out the press, or certain elements thereof, for special treatment "pose a particular danger of abuse by the State," *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 228 (1987), and so are always

subject to at least some degree of heightened First Amendment scrutiny. See *Preferred Communications*, 476 U. S., at 496 ("Where a law is subjected to a colorable First Amendment challenge, the rule of rationality which will sustain legislation against other constitutional challenges typically does not have the same controlling force"). Because the must-carry provisions impose special obligations upon cable operators and special burdens upon cable programmers, some measure of heightened First Amendment scrutiny is demanded. See *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 583 (1983).

B

At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal. See *Leathers* v. *Medlock*, 499 U. S., at 449 (citing *Cohen* v. *California*, 403 U. S. 15, 24 (1971)); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 638, 640–642 (1943). Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes this essential right. Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion. These restrictions "rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 116 (1991).

For these reasons, the First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals. *R. A. V.* v. *St. Paul*, 505 U. S. 377, 382–383 (1992); *Texas* v. *Johnson*, 491 U. S. 397,

414 (1989). Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. See *Simon & Schuster,* 502 U. S., at 115; *id.,* at 125–126 (KENNEDY, J., concurring in judgment); *Perry Ed. Assn.* v. *Perry Local Educators' Assn.,* 460 U. S. 37, 45 (1983). Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny. See *Riley* v. *National Federation for Blind of N. C., Inc.,* 487 U. S., at 798; *West Virginia Bd. of Ed.* v. *Barnette, supra.* In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, see *Clark* v. *Community for Creative Non-Violence,* 468 U. S. 288, 293 (1984), because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.

Deciding whether a particular regulation is content based or content neutral is not always a simple task. We have said that the "principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Ward* v. *Rock Against Racism,* 491 U. S. 781, 791 (1989). See *R. A. V., supra,* at 386 ("The government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed"). The purpose, or justification, of a regulation will often be evident on its face. See *Frisby* v. *Schultz,* 487 U. S. 474, 481 (1988). But while a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases. Cf. *Simon & Schuster, supra,* at 117 (" '[I]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment' ") (quoting *Minneapolis Star & Tribune, supra,* at 592). Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates

based on content. *Arkansas Writers' Project*, 481 U. S., at 231–232; *Carey* v. *Brown*, 447 U. S. 455, 464–469 (1980).

As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based. See, *e. g., Burson* v. *Freeman*, 504 U. S. 191, 197 (1992) ("Whether individuals may exercise their free-speech rights near polling places depends entirely on whether their speech is related to a political campaign"); *Boos* v. *Barry*, 485 U. S. 312, 318–319 (1988) (plurality opinion) (whether municipal ordinance permits individuals to "picket in front of a foreign embassy depends entirely upon whether their picket signs are critical of the foreign government or not"). By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral. See, *e. g., Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 804 (1984) (ordinance prohibiting the posting of signs on public property "is neutral—indeed it is silent—concerning any speaker's point of view"); *Heffron* v. *International Soc. for Krishna Consciousness, Inc.*, 452 U. S. 640, 649 (1981) (State Fair regulation requiring that sales and solicitations take place at designated locations "applies evenhandedly to all who wish to distribute and sell written materials or to solicit funds").

## C

Insofar as they pertain to the carriage of full-power broadcasters, the must-carry rules, on their face, impose burdens and confer benefits without reference to the content of speech.[6] Although the provisions interfere with cable oper-

---

[6] The must-carry rules also require carriage, under certain limited circumstances, of low-power broadcast stations. 47 U. S. C. § 534(c); see n. 2, *supra.* Under the Act, a low-power station may become eligible for carriage only if, among other things, the FCC determines that the station's programming "would address local news and informational needs which are not being adequately served by full power television broadcast sta-

ators' editorial discretion by compelling them to offer carriage to a certain minimum number of broadcast stations, the extent of the interference does not depend upon the content of the cable operators' programming. The rules impose obligations upon all operators, save those with fewer than 300 subscribers, regardless of the programs or stations they now offer or have offered in the past. Nothing in the Act imposes a restriction, penalty, or burden by reason of the views, programs, or stations the cable operator has selected or will select. The number of channels a cable operator must set aside depends only on the operator's channel capacity, see 47 U. S. C. §§ 534(b)(1), 535(b)(2)–(3) (1988 ed., Supp. IV); hence, an operator cannot avoid or mitigate its obligations under the Act by altering the programming it offers to subscribers. Cf. *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S., at 256–257 (newspaper may avoid access obligations by refraining from speech critical of political candidates).

tions because of the geographic distance of such full power stations from the low power station's community of license." § 534(h)(2)(B). We recognize that this aspect of § 4 appears to single out certain low-power broadcasters for special benefits on the basis of content. Because the District Court did not address whether these particular provisions are content based, and because the parties make only the most glancing reference to the operation of, and justifications for, the low-power broadcast provisions, we think it prudent to allow the District Court to consider the content-neutral or content-based character of this provision in the first instance on remand.

In a similar vein, although a broadcast station's eligibility for must-carry is based upon its geographic proximity to a qualifying cable system, § 534(h)(1)(C)(i), the Act permits the FCC to grant must-carry privileges upon request to otherwise ineligible broadcast stations. In acting upon these requests, the FCC is directed to give "attention to the value of localism" and, in particular, to whether the requesting station "provides news coverage of issues of concern to such community . . . or coverage of sporting and other events of interest to the community." § 534(h)(1)(C)(ii). Again, the District Court did not address this provision, but may do so on remand.

The must-carry provisions also burden cable programmers by reducing the number of channels for which they can compete. But, again, this burden is unrelated to content, for it extends to all cable programmers irrespective of the programming they choose to offer viewers. Cf. *Boos, supra,* at 319 (individuals may picket in front of a foreign embassy so long as their picket signs are not critical of the foreign government). And finally, the privileges conferred by the must-carry provisions are also unrelated to content. The rules benefit all full power broadcasters who request carriage—be they commercial or noncommercial, independent or network affiliated, English or Spanish language, religious or secular. The aggregate effect of the rules is thus to make every full power commercial and noncommercial broadcaster eligible for must-carry, provided only that the broadcaster operates within the same television market as a cable system.

It is true that the must-carry provisions distinguish between speakers in the television programming market. But they do so based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry: Broadcasters, which transmit over the airwaves, are favored, while cable programmers, which do not, are disfavored. Cable operators, too, are burdened by the carriage obligations, but only because they control access to the cable conduit. So long as they are not a subtle means of exercising a content preference, speaker distinctions of this nature are not presumed invalid under the First Amendment.

That the must-carry provisions, on their face, do not burden or benefit speech of a particular content does not end the inquiry. Our cases have recognized that even a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys. *United States* v. *Eichman,* 496 U. S. 310, 315 (1990) ("Although the Flag Protection Act contains no explicit content-

based limitation on the scope of prohibited conduct, it is nevertheless clear that the Government's asserted *interest* is related to the suppression of free expression") (emphasis in original) (internal quotation marks omitted); see also *Ward,* 491 U. S., at 791–792; *Clark* v. *Community for Creative Non-Violence,* 468 U. S., at 293; cf. *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 534–535 (1993).

Appellants contend, in this regard, that the must-carry regulations are content based because Congress' purpose in enacting them was to promote speech of a favored content. We do not agree. Our review of the Act and its various findings persuades us that Congress' overriding objective in enacting must-carry was not to favor programming of a particular subject matter, viewpoint, or format, but rather to preserve access to free television programming for the 40 percent of Americans without cable.

In unusually detailed statutory findings, *supra,* at 632–634, Congress explained that because cable systems and broadcast stations compete for local advertising revenue, §§ 2(a)(14)–(15), and because cable operators have a vested financial interest in favoring their affiliated programmers over broadcast stations, § 2(a)(5), cable operators have a built-in "economic incentive . . . to delete, reposition, or not carry local broadcast signals," § 2(a)(16). Congress concluded that absent a requirement that cable systems carry the signals of local broadcast stations, the continued availability of free local broadcast television would be threatened. *Ibid.* Congress sought to avoid the elimination of broadcast television because, in its words, "[s]uch programming is . . . free to those who own television sets and do not require cable transmission to receive broadcast television signals," § 2(a)(12), and because "[t]here is a substantial governmental interest in promoting the continued availability of such free television programming, especially for viewers who are unable to afford other means of receiving programming," *ibid.*

By preventing cable operators from refusing carriage to broadcast television stations, the must-carry rules ensure that broadcast television stations will retain a large enough potential audience to earn necessary advertising revenue— or, in the case of noncommercial broadcasters, sufficient viewer contributions, see § 2(a)(8)(B)—to maintain their continued operation. In so doing, the provisions are designed to guarantee the survival of a medium that has become a vital part of the Nation's communication system, and to ensure that every individual with a television set can obtain access to free television programming.

This overriding congressional purpose is unrelated to the content of expression disseminated by cable and broadcast speakers. Indeed, our precedents have held that "protecting noncable households from loss of regular television broadcasting service due to competition from cable systems," is not only a permissible governmental justification, but an "important and substantial federal interest." *Capital Cities Cable, Inc.* v. *Crisp*, 467 U. S. 691, 714 (1984); see also *United States* v. *Midwest Video Corp.*, 406 U. S. 649, 661–662, 664 (1972) (plurality opinion).

The design and operation of the challenged provisions confirm that the purposes underlying the enactment of the must-carry scheme are unrelated to the content of speech. The rules, as mentioned, confer must-carry rights on all full power broadcasters, irrespective of the content of their programming. They do not require or prohibit the carriage of particular ideas or points of view. They do not penalize cable operators or programmers because of the content of their programming. They do not compel cable operators to affirm points of view with which they disagree. They do not produce any net decrease in the amount of available speech. And they leave cable operators free to carry whatever programming they wish on all channels not subject to must-carry requirements.

Appellants and JUSTICE O'CONNOR make much of the fact that, in the course of describing the purposes behind the Act, Congress referred to the value of broadcast programming. In particular, Congress noted that broadcast television is "an important source of local news[,] public affairs programming and other local broadcast services critical to an informed electorate," § 2(a)(11); see also § 2(a)(10), and that noncommercial television "provides educational and informational programming to the Nation's citizens," § 2(a)(8). We do not think, however, that such references cast any material doubt on the content-neutral character of must-carry. That Congress acknowledged the local orientation of broadcast programming and the role that noncommercial stations have played in educating the public does not indicate that Congress regarded broadcast programming as *more* valuable than cable programming. Rather, it reflects nothing more than the recognition that the services provided by broadcast television have some intrinsic value and, thus, are worth preserving against the threats posed by cable. See 819 F. Supp., at 44 ("Congress' solicitousness for local broadcasters' material simply rests on its assumption that they have as much to say of interest or value as the cable programmers who service a given geographic market audience").

The operation of the Act further undermines the suggestion that Congress' purpose in enacting must-carry was to force programming of a "local" or "educational" content on cable subscribers. The provisions, as we have stated, benefit all full power broadcasters irrespective of the nature of their programming. In fact, if a cable system were required to bump a cable programmer to make room for a broadcast station, nothing would stop a cable operator from displacing a cable station that provides all local- or education-oriented programming with a broadcaster that provides very little. Appellants do not even contend, moreover, that broadcast programming is any more "local" or "educational" than cable programming. Cf. *Leathers* v. *Medlock*, 499 U. S., at 449

(state law imposing tax upon cable television, but exempting other media, is not content based, in part due to lack of evidence that cable programming "differs systematically in its message from that communicated by satellite broadcast programming, newspapers, or magazines").

In short, Congress' acknowledgment that broadcast television stations make a valuable contribution to the Nation's communications system does not render the must-carry scheme content based. The scope and operation of the challenged provisions make clear, in our view, that Congress designed the must-carry provisions not to promote speech of a particular content, but to prevent cable operators from exploiting their economic power to the detriment of broadcasters, and thereby to ensure that all Americans, especially those unable to subscribe to cable, have access to free television programming—whatever its content.

We likewise reject the suggestion, advanced by appellants and by Judge Williams in dissent, that the must-carry rules are content based because the preference for broadcast stations "*automatically* entails content requirements." 819 F. Supp., at 58. It is true that broadcast programming, unlike cable programming, is subject to certain limited content restraints imposed by statute and FCC regulation.[7] But it does not follow that Congress mandated cable carriage of broadcast television stations as a means of ensuring that par-

---

[7] See, *e. g.,* 47 U. S. C. § 303b (1988 ed., Supp. IV) (directing FCC to consider extent to which license renewal applicant has "served the educational and informational needs of children"); Pub. L. 102–356, § 16(a), 106 Stat. 954, note following 47 U. S. C. § 303 (1988 ed., Supp. IV) (restrictions on indecent programming); 47 U. S. C. § 312(a)(7) (allowing FCC to revoke broadcast license for willful or repeated failure to allow reasonable access to broadcast airtime for candidates seeking federal elective office); 47 CFR § 73.1920 (1993) (requiring broadcaster to notify victims of on-air personal attacks and to provide victims with opportunity to respond over the air); *En Banc Programming Inquiry,* 44 F. C. C. 2d 2303, 2312 (1960) (requiring broadcasters to air programming that serves "the public interest, convenience or necessity").

ticular programs will be shown, or not shown, on cable systems.

As an initial matter, the argument exaggerates the extent to which the FCC is permitted to intrude into matters affecting the content of broadcast programming. The FCC is forbidden by statute to engage in "censorship" or to promulgate any regulation "which shall interfere with the [broadcasters'] right of free speech." 47 U. S. C. § 326. The FCC is well aware of the limited nature of its jurisdiction, having acknowledged that it "has no authority and, in fact, is barred by the First Amendment and [§ 326] from interfering with the free exercise of journalistic judgment." *Hubbard Broadcasting, Inc.*, 48 F. C. C. 2d 517, 520 (1974). In particular, the FCC's oversight responsibilities do not grant it the power to ordain any particular type of programming that must be offered by broadcast stations; for although "the Commission may inquire of licensees what they have done to determine the needs of the community they propose to serve, the Commission may not impose upon them its private notions of what the public ought to hear." Network Programming Inquiry, Report and Statement of Policy, 25 Fed. Reg. 7293 (1960); see also *Commercial TV Stations*, 98 F. C. C. 2d 1076, 1091–1092 (1984), modified, 104 F. C. C. 2d 358 (1986), remanded in part on other grounds *sub nom. Action for Children's Television* v. *FCC*, 821 F. 2d 741 (CADC 1987).

Stations licensed to broadcast over the special frequencies reserved for "noncommercial educational" stations are subject to no more intrusive content regulation than their commercial counterparts. Noncommercial licensees must operate on a nonprofit basis, may not accept financial consideration in exchange for particular programming, and may not broadcast promotional announcements or advertisements on behalf of for-profit entities. 47 CFR §§ 73.621(d)–(e) (1993); see generally *Public Broadcasting*, 98 F. C. C. 2d 746, 751 (1984); *Educational Broadcast Stations*, 90 F. C. C. 2d 895

(1982), modified, 97 F. C. C. 2d 255 (1984). What is important for present purposes, however, is that noncommercial licensees are not required by statute or regulation to carry any specific quantity of "educational" programming or any particular "educational" programs. Noncommercial licensees, like their commercial counterparts, need only adhere to the general requirement that their programming serve "the public interest, convenience or necessity." *En Banc Programming Inquiry*, 44 F. C. C. 2d 2303, 2312 (1960). The FCC itself has recognized that "a more rigorous standard for public stations would come unnecessarily close to impinging on First Amendment rights and would run the collateral risk of stifling the creativity and innovative potential of these stations." *Public Broadcasting, supra*, at 751; see also *Public Radio and TV Programming*, 87 F. C. C. 2d 716, 728–729, 732, ¶¶ 29–30, 37 (1981); *Georgia State Bd. of Ed.*, 70 F. C. C. 2d 948 (1979).

In addition, although federal funding provided through the Corporation for Public Broadcasting (CPB) supports programming on noncommercial stations, the Government is foreclosed from using its financial support to gain leverage over any programming decisions. See 47 U. S. C. § 396(g) (1)(D) (directing CPB to "carry out its purposes and functions and engage in its activities in ways that will most effectively assure the maximum freedom of the public telecommunications entities and systems from interference with, or control of, program content or other activities"), § 398(a) (CPB operates without interference from any department, agency, or officer of the Federal Government, including the FCC).

Indeed, our cases have recognized that Government regulation over the content of broadcast programming must be narrow, and that broadcast licensees must retain abundant discretion over programming choices. See *FCC* v. *League of Women Voters of Cal.*, 468 U. S., at 378–380, 386–392 (invalidating under the First Amendment statute forbidding any noncommercial educational station that receives a grant

from the CPB to "engage in editorializing"); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S., at 126 (describing "the risk of an enlargement of Government control over the content of broadcast discussion of public issues" as being of "critical importance" to the First Amendment). Thus, given the minimal extent to which the FCC and Congress actually influence the programming offered by broadcast stations, it would be difficult to conclude that Congress enacted must-carry in an effort to exercise content control over what subscribers view on cable television. In a regime where Congress or the FCC exercised more intrusive control over the content of broadcast programming, an argument similar to appellants' might carry greater weight. But in the present regulatory system, those concerns are without foundation.

In short, the must-carry provisions are not designed to favor or disadvantage speech of any particular content. Rather, they are meant to protect broadcast television from what Congress determined to be unfair competition by cable systems. In enacting the provisions, Congress sought to preserve the existing structure of the Nation's broadcast television medium while permitting the concomitant expansion and development of cable television, and, in particular, to ensure that broadcast television remains available as a source of video programming for those without cable. Appellants' ability to hypothesize a content-based purpose for these provisions rests on little more than speculation and does not cast doubt upon the content-neutral character of must-carry. Cf. *Arizona* v. *California*, 283 U. S. 423, 455–457 (1931). Indeed, "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States* v. *O'Brien*, 391 U. S., at 383 (citing *McCray* v. *United States*, 195 U. S. 27, 56 (1904)).

## D

Appellants advance three additional arguments to support their view that the must-carry provisions warrant strict scrutiny. In brief, appellants contend that the provisions (1) compel speech by cable operators, (2) favor broadcast programmers over cable programmers, and (3) single out certain members of the press for disfavored treatment. None of these arguments suffices to require strict scrutiny in the present case.

### 1

Appellants maintain that the must-carry provisions trigger strict scrutiny because they compel cable operators to transmit speech not of their choosing. Relying principally on *Miami Herald Publishing Co. v. Tornillo*, 418 U. S. 241 (1974), appellants say this intrusion on the editorial control of cable operators amounts to forced speech which, if not *per se* invalid, can be justified only if narrowly tailored to a compelling government interest.

*Tornillo* affirmed an essential proposition: The First Amendment protects the editorial independence of the press. The right-of-reply statute at issue in *Tornillo* required any newspaper that assailed a political candidate's character to print, upon request by the candidate and without cost, the candidate's reply in equal space and prominence. Although the statute did not censor speech in the traditional sense— it only required newspapers to grant access to the messages of others—we found that it imposed an impermissible content-based burden on newspaper speech. Because the right of access at issue in *Tornillo* was triggered only when a newspaper elected to print matter critical of political candidates, it "exact[ed] a penalty on the basis of . . . content." *Id.*, at 256. We found, and continue to recognize, that right-of-reply statutes of this sort are an impermissible intrusion on newspapers' "editorial control and judgment." *Id.*, at 258.

We explained that, in practical effect, Florida's right-of-reply statute would deter newspapers from speaking in unfavorable terms about political candidates:

> "Faced with the penalties that would accrue to any newspaper that published news or commentary arguably within the reach of the right-of-access statute, editors might well conclude that the safe course is to avoid controversy. Therefore, under the operation of the Florida statute, political and electoral coverage would be blunted or reduced." *Id.*, at 257.

Moreover, by affording mandatory access to speakers with which the newspaper disagreed, the law induced the newspaper to respond to the candidates' replies when it might have preferred to remain silent. See *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.*, 475 U. S. 1, 11 (1986) (plurality opinion).

The same principles led us to invalidate a similar content-based access regulation in *Pacific Gas & Electric.* At issue was a rule requiring a privately owned utility, on a quarterly basis, to include with its monthly bills an editorial newsletter published by a consumer group critical of the utility's rate-making practices. Although the access requirement applicable to the utility, unlike the statutory mechanism in *Tornillo*, was not triggered by speech of any particular content, the plurality held that the same strict First Amendment scrutiny applied. Like the statute in *Tornillo*, the regulation conferred benefits to speakers based on viewpoint, giving access only to a consumer group opposing the utility's practices. 475 U. S., at 13, 15. The plurality observed that in order to avoid the appearance that it agreed with the group's views, the utility would "feel compelled to respond to arguments and allegations made by [the group] in its messages to [the utility's] customers." *Id.*, at 16. This "kind of forced response," the plurality explained, "is antithetical to

the free discussion that the First Amendment seeks to foster." *Ibid.*

*Tornillo* and *Pacific Gas & Electric* do not control this case for the following reasons. First, unlike the access rules struck down in those cases, the must-carry rules are content neutral in application. They are not activated by any particular message spoken by cable operators and thus exact no content-based penalty. Cf. *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S., at 795 (solicitation of funds triggers requirement to express government-favored message). Likewise, they do not grant access to broadcasters on the ground that the content of broadcast programming will counterbalance the messages of cable operators. Instead, they confer benefits upon all full-power, local broadcasters, whatever the content of their programming. Cf. *Pacific Gas & Electric, supra,* at 14 (access "awarded only to those who disagree with appellant's views and who are hostile to appellant's interests").

Second, appellants do not suggest, nor do we think it the case, that must-carry will force cable operators to alter their own messages to respond to the broadcast programming they are required to carry. See Brenner, Cable Television and the Freedom of Expression, 1988 Duke L. J., at 379 ("Other than adding new ideas—offensive, insightful or tedious—the [speaker granted access to cable] does not influence an operator's agenda"). Given cable's long history of serving as a conduit for broadcast signals, there appears little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator. Indeed, broadcasters are required by federal regulation to identify themselves at least once every hour, 47 CFR § 73.1201 (1993), and it is a common practice for broadcasters to disclaim any identity of viewpoint between the management and the speakers who use the broadcast facility. Cf. *PruneYard Shopping Center* v. *Robins,* 447 U. S. 74, 87 (1980) (noting that the views ex-

pressed by speakers who are granted a right of access to a shopping center would "not likely be identified with those of the owner"). Moreover, in contrast to the statute at issue in *Tornillo*, no aspect of the must-carry provisions would cause a cable operator or cable programmer to conclude that "the safe course is to avoid controversy," *Tornillo*, 418 U. S., at 257, and by so doing diminish the free flow of information and ideas.

Finally, the asserted analogy to *Tornillo* ignores an important technological difference between newspapers and cable television. Although a daily newspaper and a cable operator both may enjoy monopoly status in a given locale, the cable operator exercises far greater control over access to the relevant medium. A daily newspaper, no matter how secure its local monopoly, does not possess the power to obstruct readers' access to other competing publications—whether they be weekly local newspapers, or daily newspapers published in other cities. Thus, when a newspaper asserts exclusive control over its own news copy, it does not thereby prevent other newspapers from being distributed to willing recipients in the same locale.

The same is not true of cable. When an individual subscribes to cable, the physical connection between the television set and the cable network gives the cable operator bottleneck, or gatekeeper, control over most (if not all) of the television programming that is channeled into the subscriber's home. Hence, simply by virtue of its ownership of the essential pathway for cable speech, a cable operator can prevent its subscribers from obtaining access to programming it chooses to exclude. A cable operator, unlike speakers in other media, can thus silence the voice of competing speakers with a mere flick of the switch.[8]

---

[8] As one commentator has observed: "The central dilemma of cable is that it has unlimited capacity to accommodate as much diversity and as many publishers as print, yet all of the producers and publishers use the same physical plant. . . . If the cable system is itself a publisher, it may

The potential for abuse of this private power over a central avenue of communication cannot be overlooked. See *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 557 (1975) ("Each medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems"). The First Amendment's command that government not impede the freedom of speech does not disable the government from taking steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas. See *Associated Press* v. *United States,* 326 U. S., at 20. We thus reject appellants' contention that *Tornillo* and *Pacific Gas & Electric* require strict scrutiny of the access rules in question here.

2

Second, appellants urge us to apply strict scrutiny because the must-carry provisions favor one set of speakers (broadcast programmers) over another (cable programmers). Appellants maintain that as a consequence of this speaker preference, some cable programmers who would have secured carriage in the absence of must-carry may now be dropped. Relying on language in *Buckley* v. *Valeo,* 424 U. S. 1 (1976), appellants contend that such a regulation is presumed invalid under the First Amendment because the government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others." *Id.,* at 48–49.

To the extent appellants' argument rests on the view that all regulations distinguishing between speakers warrant strict scrutiny, see Brief for Appellants Turner Broadcasting System, Inc., et al. 29, it is mistaken. At issue in *Buckley* was a federal law prohibiting individuals from spending more than $1,000 per year to support or oppose a particular political candidate. The Government justified the law as a means

restrict the circumstances under which it allows others also to use its system." I. de Sola Pool, Technologies of Freedom 168 (1983).

of "equalizing the relative ability of individuals and groups to influence the outcome of elections." *Buckley*, 424 U. S., at 48. We rejected that argument with the observation that Congress may not "abridge the rights of some persons to engage in political expression in order to enhance the relative voice of other segments of our society." *Id.*, at 49, n. 55.

Our holding in *Buckley* does not support appellants' broad assertion that all speaker-partial laws are presumed invalid. Rather, it stands for the proposition that speaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say). See *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540, 548 (1983) (rejecting First Amendment challenge to differential tax treatment of veterans groups and other charitable organizations, but noting that the case would be different were there any "indication that the statute was intended to suppress any ideas or any demonstration that it has had that effect"). Because the expenditure limit in *Buckley* was designed to ensure that the political speech of the wealthy not drown out the speech of others, we found that it was concerned with the communicative impact of the regulated speech. See *Buckley*, *supra*, at 17 ("[I]t is beyond dispute that the interest in regulating the . . . giving or spending [of] money 'arises in some measure because the communication . . . is itself thought to be harmful'") (quoting *United States* v. *O'Brien*, 391 U. S., at 382). Indeed, were the expenditure limitation unrelated to the content of expression, there would have been no perceived need for Congress to "equaliz[e] the relative ability" of interested individuals to influence elections. 424 U. S., at 48. *Buckley* thus stands for the proposition that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.

The question here is whether Congress preferred broadcasters over cable programmers based on the content of pro-

gramming each group offers. The answer, as we explained, *supra*, at 643–652, is no. Congress granted must-carry privileges to broadcast stations on the belief that the broadcast television industry is in economic peril due to the physical characteristics of cable transmission and the economic incentives facing the cable industry. Thus, the fact that the provisions benefit broadcasters and not cable programmers does not call for strict scrutiny under our precedents.

### 3

Finally, appellants maintain that strict scrutiny applies because the must-carry provisions single out certain members of the press—here, cable operators—for disfavored treatment. See, *e. g.*, Brief for Appellant Time Warner Entertainment Co. 28–30. In support, appellants point out that Congress has required cable operators to provide carriage to broadcast stations, but has not imposed like burdens on analogous video delivery systems, such as multichannel multipoint distribution (MMDS) systems and satellite master antenna television (SMATV) systems. Relying upon our precedents invalidating discriminatory taxation of the press, see, *e. g.*, *Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221 (1987); *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue,* 460 U. S. 575 (1983); *Grosjean* v. *American Press Co.,* 297 U. S. 233 (1936), appellants contend that this sort of differential treatment poses a particular danger of abuse by the Government and should be presumed invalid.

Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns. *Minneapolis Star,* for example, considered a use tax imposed on the paper and ink used in the production of newspapers. We subjected the tax to strict scrutiny for two reasons: first, because it applied only to the press; and, second, because in practical application it fell upon only a small number of newspapers. *Minne-*

*apolis Star, supra,* at 585, 591–592; see also *Grosjean, supra*
(invalidating Louisiana tax on publications with weekly cir-
culations above 20,000, which fell on 13 of the approximately
135 newspapers distributed in the State). The sales tax at
issue in *Arkansas Writers' Project,* which applied to general
interest magazines but exempted religious, professional,
trade, and sports magazines, along with all newspapers, suf-
fered the second of these infirmities. In operation, the tax
was levied upon a limited number of publishers and also dis-
criminated on the basis of subject matter. *Arkansas Writ-
ers' Project, supra,* at 229–230. Relying in part on *Minne-
apolis Star,* we held that this selective taxation of the press
warranted strict scrutiny. 481 U. S., at 231.

It would be error to conclude, however, that the First
Amendment mandates strict scrutiny for any speech regula-
tion that applies to one medium (or a subset thereof) but
not others. In *Leathers* v. *Medlock,* 499 U. S. 439 (1991), for
example, we upheld against First Amendment challenge the
application of a general state tax to cable television services,
even though the print media and scrambled satellite broad-
cast television services were exempted from taxation. As
*Leathers* illustrates, the fact that a law singles out a certain
medium, or even the press as a whole, "is insufficient by itself
to raise First Amendment concerns." *Id.,* at 452. Rather,
laws of this nature are "constitutionally suspect only in cer-
tain circumstances." *Id.,* at 444. The taxes invalidated in
*Minneapolis Star* and *Arkansas Writers' Project,* for exam-
ple, targeted a small number of speakers, and thus threat-
ened to "distort the market for ideas." 499 U. S., at 448.
Although there was no evidence that an illicit governmental
motive was behind either of the taxes, both were structured
in a manner that raised suspicions that their objective was,
in fact, the suppression of certain ideas. See *Arkansas
Writers' Project, supra,* at 228–229; *Minneapolis Star,* 460
U. S., at 585. But such heightened scrutiny is unwarranted
when the differential treatment is "justified by some special

characteristic of" the particular medium being regulated. *Ibid.*

The must-carry provisions, as we have explained above, are justified by special characteristics of the cable medium: the bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television. Appellants do not argue, nor does it appear, that other media—in particular, media that transmit video programming such as MMDS and SMATV—are subject to bottleneck monopoly control, or pose a demonstrable threat to the survival of broadcast television. It should come as no surprise, then, that Congress decided to impose the must-carry obligations upon cable operators only.

In addition, the must-carry provisions are not structured in a manner that carries the inherent risk of undermining First Amendment interests. The regulations are broad based, applying to almost all cable systems in the country, rather than just a select few. See 47 U. S. C. § 534(b)(1) (1988 ed., Supp. IV) (only cable systems with fewer than 300 subscribers exempted from must-carry). As a result, the provisions do not pose the same dangers of suppression and manipulation that were posed by the more narrowly targeted regulations in *Minneapolis Star* and *Arkansas Writers' Project.* For these reasons, the must-carry rules do not call for strict scrutiny. See *Leathers, supra,* at 449, 453 (upholding state sales tax which applied to about 100 cable systems "offering a wide variety of programming" because the tax was not "likely to stifle the free exchange of ideas" and posed no "danger of suppress[ion]").

### III

### A

In sum, the must-carry provisions do not pose such inherent dangers to free expression, or present such potential for censorship or manipulation, as to justify application of the most exacting level of First Amendment scrutiny. We agree

with the District Court that the appropriate standard by which to evaluate the constitutionality of must-carry is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech. See *Ward* v. *Rock Against Racism,* 491 U. S. 781 (1989); *United States* v. *O'Brien,* 391 U. S. 367 (1968).

Under *O'Brien,* a content-neutral regulation will be sustained if

> "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.,* at 377.

To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. "Rather, the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward, supra,* at 799 (quoting *United States* v. *Albertini,* 472 U. S. 675, 689 (1985)). Narrow tailoring in this context requires, in other words, that the means chosen do not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward, supra,* at 799.

Congress declared that the must-carry provisions serve three interrelated interests: (1) preserving the benefits of free, over-the-air local broadcast television, (2) promoting the widespread dissemination of information from a multiplicity of sources, and (3) promoting fair competition in the market for television programming. S. Rep. No. 102–92, p. 58 (1991); H. R. Rep. No. 102–628, p. 63 (1992); 1992 Cable Act, §§ 2(a)(8), (9), and (10). None of these interests is related to the "suppression of free expression," *O'Brien,* 391 U. S., at 377, or to the content of any speakers' messages. And

viewed in the abstract, we have no difficulty concluding that each of them is an important governmental interest. *Ibid.*

In the Communications Act of 1934, Congress created a system of free broadcast service and directed that communications facilities be licensed across the country in a "fair, efficient, and equitable" manner. Communications Act of 1934, § 307(b), 48 Stat. 1083, 47 U. S. C. § 307(b). Congress designed this system of allocation to afford each community of appreciable size an over-the-air source of information and an outlet for exchange on matters of local concern. *United States* v. *Southwestern Cable Co.*, 392 U. S. 157, 173–174 (1968); Wollenberg, The FCC as Arbiter of "The Public Interest, Convenience, and Necessity," in A Legislative History of the Communications Act of 1934, pp. 61, 62–70 (M. Paglin ed. 1989). As we recognized in *Southwestern Cable, supra,* the importance of local broadcasting outlets "can scarcely be exaggerated, for broadcasting is demonstrably a principal source of information and entertainment for a great part of the Nation's population." *Id.,* at 177. The interest in maintaining the local broadcasting structure does not evaporate simply because cable has come upon the scene. Although cable and other technologies have ushered in alternatives to broadcast television, nearly 40 percent of American households still rely on broadcast stations as their exclusive source of television programming. And as we said in *Capital Cities Cable, Inc.* v. *Crisp,* "protecting noncable households from loss of regular television broadcasting service due to competition from cable systems" is an important federal interest. 467 U. S., at 714.

Likewise, assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment. Indeed, " 'it has long been a basic tenet of national communications policy that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." ' " *United*

*States* v. *Midwest Video Corp.,* 406 U. S., at 668, n. 27 (plurality opinion) (quoting *Associated Press* v. *United States,* 326 U. S., at 20); see also *FCC* v. *WNCN Listeners Guild,* 450 U. S. 582, 594 (1981); *FCC* v. *National Citizens Comm. for Broadcasting,* 436 U. S. 775, 795 (1978). Finally, the Government's interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment. See *Lorain Journal Co.* v. *United States,* 342 U. S. 143 (1951); *Associated Press* v. *United States, supra;* cf. *FTC* v. *Superior Court Trial Lawyers Assn.,* 493 U. S. 411, 431–432 (1990).

B

That the Government's asserted interests are important in the abstract does not mean, however, that the must-carry rules will in fact advance those interests. When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." *Quincy Cable TV, Inc.* v. *FCC,* 768 F. 2d 1434, 1455 (CADC 1985). It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way. See *Edenfield* v. *Fane,* 507 U. S. 761, 770–771 (1993); *Los Angeles* v. *Preferred Communications, Inc.,* 476 U. S., at 496 ("This Court may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity") (internal quotation marks omitted); *Home Box Office, Inc.* v. *FCC,* 567 F. 2d 9, 36 (CADC 1977) ("[A] 'regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist'") (citation omitted).

Thus, in applying *O'Brien* scrutiny we must ask first whether the Government has adequately shown that the eco-

nomic health of local broadcasting is in genuine jeopardy and in need of the protections afforded by must-carry. Assuming an affirmative answer to the foregoing question, the Government still bears the burden of showing that the remedy it has adopted does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U. S., at 799. On the state of the record developed thus far, and in the absence of findings of fact from the District Court, we are unable to conclude that the Government has satisfied either inquiry.

In defending the factual necessity for must-carry, the Government relies in principal part on Congress' legislative finding that, absent mandatory carriage rules, the continued viability of local broadcast television would be "seriously jeopardized." § 2(a)(16). See Brief for Federal Appellees 31–32. The Government contends that this finding, though predictive in nature, must be accorded great weight in the First Amendment inquiry, especially when, as here, Congress has sought to "address the relationship between two technical, rapidly changing, and closely interdependent industries—broadcasting and cable." *Id.*, at 30.

We agree that courts must accord substantial deference to the predictive judgments of Congress. See, *e. g.*, *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S., at 103 (The "judgment of the Legislative Branch" should not be ignored "simply because [appellants] cas[t] [their] claims under the umbrella of the First Amendment"). Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable. See *FCC* v. *National Citizens Comm. for Broadcasting, supra*, at 814; *FPC* v. *Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1, 29 (1961). As an institution, moreover, Congress is far better equipped than the judiciary to "amass and evaluate the vast amounts of data" bearing upon an issue as complex and

dynamic as that presented here. *Walters* v. *National Assn. of Radiation Survivors,* 473 U. S. 305, 331, n. 12 (1985). And Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review.

That Congress' predictive judgments are entitled to substantial deference does not mean, however, that they are insulated from meaningful judicial review altogether. On the contrary, we have stressed in First Amendment cases that the deference afforded to legislative findings does "not foreclose our independent judgment of the facts bearing on an issue of constitutional law." *Sable Communications of Cal., Inc.* v. *FCC,* 492 U. S. 115, 129 (1989); see also *Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829, 843 (1978). This obligation to exercise independent judgment when First Amendment rights are implicated is not a license to reweigh the evidence *de novo,* or to replace Congress' factual predictions with our own. Rather, it is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence. See *Century Communications Corp.* v. *FCC,* 835 F. 2d 292, 304 (CADC 1987) ("[W]hen trenching on first amendment interests, even incidentally, the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures").

The Government's assertion that the must-carry rules are necessary to protect the viability of broadcast television rests on two essential propositions: (1) that unless cable operators are compelled to carry broadcast stations, significant numbers of broadcast stations will be refused carriage on cable systems; and (2) that the broadcast stations denied carriage will either deteriorate to a substantial degree or fail altogether.

As support for the first proposition, the Government relies upon a 1988 FCC study showing, at a time when no must-carry rules were in effect, that approximately 20 percent of cable systems reported dropping or refusing carriage to one

or more local broadcast stations on at least one occasion. See Cable System Broadcast Signal Carriage Survey, Staff Report by the Policy and Rules Division, Mass Media Bureau, p. 10 (Sept. 1, 1988) (Table 2), cited in S. Rep. No. 102–92, at 42–43. The record does not indicate, however, the time frame within which these drops occurred, or how many of these stations were dropped for only a temporary period and then restored to carriage. The same FCC study indicates that about 23 percent of the cable operators reported shifting the channel positions of one or more local broadcast stations, and that, in most cases, the repositioning was done for "marketing" rather than "technical" reasons. *Id.*, at 44 (citing Signal Carriage Survey, *supra*, at 19, 22 (Tables 10 and 13)).

The parties disagree about the significance of these statistics. But even if one accepts them as evidence that a large number of broadcast stations would be dropped or repositioned in the absence of must-carry, the Government must further demonstrate that broadcasters so affected would suffer financial difficulties as a result. Without a more substantial elaboration in the District Court of the predictive or historical evidence upon which Congress relied, or the introduction of some additional evidence to establish that the dropped or repositioned broadcasters would be at serious risk of financial difficulty, we cannot determine whether the threat to broadcast television is real enough to overcome the challenge to the provisions made by these appellants. We think it significant, for instance, that the parties have not presented any evidence that local broadcast stations have fallen into bankruptcy, turned in their broadcast licenses, curtailed their broadcast operations, or suffered a serious reduction in operating revenues as a result of their being dropped from, or otherwise disadvantaged by, cable systems.

The paucity of evidence indicating that broadcast television is in jeopardy is not the only deficiency in this record. Also lacking are any findings concerning the actual effects of

must-carry on the speech of cable operators and cable programmers—*i. e.*, the extent to which cable operators will, in fact, be forced to make changes in their current or anticipated programming selections; the degree to which cable programmers will be dropped from cable systems to make room for local broadcasters; and the extent to which cable operators can satisfy their must-carry obligations by devoting previously unused channel capacity to the carriage of local broadcasters. The answers to these and perhaps other questions are critical to the narrow tailoring step of the *O'Brien* analysis, for unless we know the extent to which the must-carry provisions in fact interfere with protected speech, we cannot say whether they suppress "substantially more speech than . . . necessary" to ensure the viability of broadcast television. *Ward*, 491 U. S., at 799. Finally, the record fails to provide any judicial findings concerning the availability and efficacy of "constitutionally acceptable less restrictive means" of achieving the Government's asserted interests. See *Sable Communications, supra*, at 129.

In sum, because there are genuine issues of material fact still to be resolved on this record, we hold that the District Court erred in granting summary judgment in favor of the Government. See *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 250 (1986). Because of the unresolved factual questions, the importance of the issues to the broadcast and cable industries, and the conflicting conclusions that the parties contend are to be drawn from the statistics and other evidence presented, we think it necessary to permit the parties to develop a more thorough factual record, and to allow the District Court to resolve any factual disputes remaining, before passing upon the constitutional validity of the challenged provisions.

The judgment below is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring.

I join JUSTICE KENNEDY's opinion, which aptly identifies and analyzes the First Amendment concerns and principles that should guide consideration of free speech issues in the expanding cable industry. I write to emphasize the paramount importance of according substantial deference to the predictive judgments of Congress, see, *e. g., Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 103 (1973), particularly where, as here, that legislative body has compiled an extensive record in the course of reaching its judgment. Nonetheless, the standard for summary judgment is high, and no less so when First Amendment values are at stake and the issue is of far-reaching importance. Because in this case there remain a few unresolved issues of material fact, a remand is appropriate. The Government had occasion to submit to the District Court only portions of the record developed by Congress. In light of the Court's opinion today, those portions, which were submitted to defeat a motion for summary judgment, are not adequate to support one. The record before the District Court no doubt will benefit from any additional evidence the Government and the other parties now see fit to present.

JUSTICE STEVENS, concurring in part and concurring in the judgment.

As JUSTICE KENNEDY has ably explained, the "overriding congressional purpose" of the challenged must-carry provisions of the 1992 Cable Act is to "guarantee the survival of a medium that has become a vital part of the Nation's communication system," a purpose that is "unrelated to the content of expression." *Ante,* at 647. The public interests in protecting access to television for the millions of homes without cable and in assuring the availability of "a multiplicity of information sources" are unquestionably substantial. *Ante,* at 663. The must-carry provisions are amply "justi-

fied by special characteristics of the cable medium," namely, "the bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television." *Ante*, at 661. Cable operators' control of essential facilities provides a basis for intrusive regulation that would be inappropriate and perhaps impermissible for other communicative media.

While I agree with most of JUSTICE KENNEDY's reasoning, and join Parts I, II–C, II–D, and III–A of his opinion, I part ways with him on the appropriate disposition of this case. In my view the District Court's judgment sustaining the must-carry provisions should be affirmed. The District Court majority evaluated §§ 4 and 5 as content-neutral regulations of protected speech according to the same standard that JUSTICE KENNEDY's opinion instructs it to apply on remand. In my view, the District Court reached the correct result the first time around. Economic measures are always subject to second-guessing; they rest on inevitably provisional and uncertain forecasts about the future effect of legal rules in complex conditions. Whether Congress might have accomplished its goals more efficiently through other means; whether it correctly interpreted emerging trends in the protean communications industry; and indeed whether must-carry is actually imprudent as a matter of policy will remain matters of debate long after the 1992 Act has been repealed or replaced by successor legislation. But the question for us is merely whether *Congress* could fairly conclude that cable operators' monopoly position threatens the continued viability of broadcast television and that must-carry is an appropriate means of minimizing that risk.[1]

---

[1] I have no quarrel with JUSTICE KENNEDY's general statement that the question for the reviewing court in a case of this kind is merely whether "Congress has drawn reasonable inferences based on substantial evidence," given his caveat that Congress need not compile or restrict itself to a formal record in the manner required of a judicial or administrative

As JUSTICE KENNEDY recognizes, *ante*, at 665–666, findings by the Congress, particularly those emerging from such sustained deliberations, merit special respect from this Court.[2] Accorded proper deference, the findings in § 2 are sufficient to sustain the must-carry provisions against facial attack. Congress' conclusion, for example, that broadcasters who are denied carriage on cable systems will suffer serious and potentially terminal economic harm, see § 2(a)(16), requires no "further demonstration." See *ante*, at 667. Because 60% of American households have cable, and because most cable subscribers rely solely on that medium to receive video signals, it is a practical certainty that a broadcaster dropped from the local cable system would suffer substantial economic harm. It is also clear that cable operators—particularly (but not exclusively) those affiliated with cable programmers—have both the ability and the economic incentive to exploit their gatekeeper status to the detriment of broadcasters. Thus, even if Congress had had before it no historical evidence that terminations or refusals of carriage had already occurred,[3] it could reasonably infer that cable operators' bottleneck control, together with the already high degree of vertical integration in the industry, would motivate

---

factfinder. *Ante*, at 666. In my view, however, application of that standard would require affirmance here.

[2] As JUSTICE KENNEDY observes, *ibid.*, we cannot abdicate our responsibility to decide whether a restriction on speech violates the First Amendment. But the factual findings accompanying economic measures that are enacted by Congress itself and that have only incidental effects on speech merit greater deference than those supporting content-based restrictions on speech, see *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 129 (1989); *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 843 (1978) (both cited *ante*, at 666), or restrictions imposed by administrative agencies, see, *e. g., Century Communications Corp.* v. *FCC*, 835 F. 2d 292, 304 (CADC 1987) (cited *ante*, at 666).

[3] But see H. R. Rep. No. 102–628, pp. 50–57 (1992); S. Rep. No. 102–92, pp. 43–44 (1991).

such conduct in the near future.[4]   Indeed, the main thrust
of the most pertinent congressional findings is not that cable
carriers have already eliminated broadcast competition on a
grand scale, but that given their market power they may
soon do so.[5]

An industry need not be in its death throes before Con-
gress may act to protect it from economic harm threatened
by a monopoly.   The mandatory access mechanism that Con-
gress fashioned in §§ 4 and 5 of the 1992 Act is a simple and
direct means of dealing with the dangers posed by cable op-
erators' exclusive control of what is fast becoming the preem-
inent means of transferring video signals to homes.   The
must-carry mechanism is analogous to the relief that might
be appropriate for a threatened violation of the antitrust
laws; one need only refer to undisputed facts concerning the
structure of the cable and broadcast industries to agree that
that threat is at least plausible.   Moreover, Congress did not
have to find that all broadcasters were at risk before acting
to protect vulnerable ones, for the interest in preserving ac-

---

[4] As Judge Jackson put it in his opinion for the District Court:

"[E]ven if the state of the broadcasting industry is not now as parlous as
the defendants contend, the Court finds it to be indisputable on this record
that cable operators have attained a position of dominance in the video
signal distribution market, and can henceforth exercise the attendant mar-
ket power.   The Court does not find improbable Congress' conclusion that
this market power provides cable operators with both incentive and pres-
ent ability to block non-cable programmers' access to the bulk of any pro-
spective viewing audience; unconstrained, cable holds the future of local
broadcasting at its mercy.   In light of the considerable body of evidence
amassed by Congress, and the deference this Court should accord to the
factfinding abilities of the nation's legislature, the Court must conclude
that the danger perceived by Congress is real and substantial." 819
F. Supp. 32, 46 (DC 1993) (citations omitted).

[5] See § 2(a)(16) ("As a result of the economic incentive that cable systems
have to delete, reposition, or not carry local broadcast signals, . . . the
economic viability of free local broadcast television and its ability to origi-
nate quality local programming will be seriously jeopardized"); see also
§§ 2(a)(15), 2(a)(17).

cess to free television is valid throughout the Nation. Indeed, the Act is well tailored to assist those broadcasters who are most in jeopardy. Because thriving commercial broadcasters will likely avail themselves of the remunerative "retransmission consent" procedure of § 6, those broadcasters who gain access via the § 4 must-carry route are apt to be the most economically vulnerable ones. Precisely how often broadcasters will secure carriage through § 6 rather than § 4 will depend upon future developments; the very unpredictability of this and other effects of the new regulatory scheme militates in favor of allowing the scheme to proceed rather than requiring a perfectly documented or entirely complete *ex ante* justification.

JUSTICE KENNEDY asks the three-judge panel to take additional evidence on such matters as whether the must-carry provisions really respond to threatened harms to broadcasters, whether §§ 4–5 "will in fact alleviate these harms in a direct and material way," *ante*, at 664, and "the extent to which cable operators will, in fact, be forced to make changes in their current or anticipated programming selections," *ante*, at 668. While additional evidence might cast further light on the efficacy and wisdom of the must-carry provisions, additional evidence is not necessary to resolve the question of their facial constitutionality.[6]

To predicate the facial validity of the must-carry provisions upon forecasts of the ultimate consequences of their implementation is to ask the District Court to address questions that are not at present susceptible of reliable answers. Some of the matters the lead opinion singles out for further

---

[6] The must-carry obligations may be broader than necessary to protect vulnerable broadcasters, but that would not alone be enough to demonstrate that they violate the First Amendment. Thus, for instance, to the extent that §§ 4 and 5 obligate cable operators to carry broadcasters they would have carried even in the absence of a statutory obligation, any impairment of operators' freedom of choice, or on cable programmers' ability to secure carriage, would be negligible.

review—for example, "the degree to which cable programmers will be dropped from cable systems to make room for local broadcasters," *ibid.*—depend upon predictions about the future voluntary actions of entities who are parties to this case. At best, a remand for consideration of such factors will require the District Court to engage in speculation; it may actually invite the parties to adjust their conduct in an effort to affect the result of this litigation (perhaps by opting to drop cable programs rather than seeking to increase total channel capacity). The must-carry provisions may ultimately prove an ineffective or needlessly meddlesome means of achieving Congress' legitimate goals. However, such a conclusion could be confidently drawn, if ever, only after the must-carry scheme has been tested by experience. On its face, that scheme is rationally calculated to redress the dangers that Congress discerned after its lengthy investigation of the relationship between the cable and broadcasting industries.

It is thus my view that we should affirm the judgment of the District Court. Were I to vote to affirm, however, no disposition of this appeal would command the support of a majority of the Court. An accommodation is therefore necessary. See *Screws* v. *United States*, 325 U. S. 91, 134 (1945) (Rutledge, J., concurring in result). Accordingly, because I am in substantial agreement with JUSTICE KENNEDY's analysis of the case, I concur in the judgment vacating and remanding for further proceedings.

JUSTICE O'CONNOR, with whom JUSTICE SCALIA and JUSTICE GINSBURG join, and with whom JUSTICE THOMAS joins as to Parts I and III, concurring in part and dissenting in part.

There are only so many channels that any cable system can carry. If there are fewer channels than programmers who want to use the system, some programmers will have to be dropped. In the must-carry provisions of the Cable

Television Consumer Protection and Competition Act of 1992, Pub. L. 102–385, 106 Stat. 1460, Congress made a choice: By reserving a little over one-third of the channels on a cable system for broadcasters, it ensured that in most cases it will be a cable programmer who is dropped and a broadcaster who is retained. The question presented in this case is whether this choice comports with the commands of the First Amendment.

## I

### A

The 1992 Cable Act implicates the First Amendment rights of two classes of speakers. First, it tells cable operators which programmers they must carry, and keeps cable operators from carrying others that they might prefer. Though cable operators do not actually originate most of the programming they show, the Court correctly holds that they are, for First Amendment purposes, speakers. *Ante*, at 636. Selecting which speech to retransmit is, as we know from the example of publishing houses, movie theaters, bookstores, and Reader's Digest, no less communication than is creating the speech in the first place.

Second, the Act deprives a certain class of video programmers—those who operate cable channels rather than broadcast stations—of access to over one-third of an entire medium. Cable programmers may compete only for those channels that are not set aside by the must-carry provisions. A cable programmer that might otherwise have been carried may well be denied access in favor of a broadcaster that is less appealing to the viewers but is favored by the must-carry rules. It is as if the Government ordered all movie theaters to reserve at least one-third of their screening for films made by American production companies, or required all bookstores to devote one-third of their shelf space to nonprofit publishers. As the Court explains in Parts I, II–A, and II–B of its opinion, which I join, cable programmers and

operators stand in the same position under the First Amendment as do the more traditional media.

Under the First Amendment, it is normally not within the government's power to decide who may speak and who may not, at least on private property or in traditional public fora. The government does have the power to impose content-neutral time, place, and manner restrictions, but this is in large part precisely because such restrictions apply to all speakers. Laws that treat all speakers equally are relatively poor tools for controlling public debate, and their very generality creates a substantial political check that prevents them from being unduly burdensome. Laws that single out particular speakers are substantially more dangerous, even when they do not draw explicit content distinctions. See, e. g., *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 584, 591–592 (1983); see also *Leathers* v. *Medlock*, 499 U. S. 439, 447 (1991).

I agree with the Court that some speaker-based restrictions—those genuinely justified without reference to content—need not be subject to strict scrutiny. But looking at the statute at issue, I cannot avoid the conclusion that its preference for broadcasters over cable programmers is justified with reference to content. The findings, enacted by Congress as § 2 of the Act, and which I must assume state the justifications for the law, make. this clear. "There is a substantial governmental and First Amendment interest in promoting a diversity of views provided through multiple technology media." § 2(a)(6). "[P]ublic television provides educational and informational programming to the Nation's citizens, thereby advancing the Government's compelling interest in educating its citizens." § 2(a)(8)(A). "A primary objective and benefit of our Nation's system of regulation of television broadcasting is the local origination of programming. There is a substantial governmental interest in ensuring its continuation." § 2(a)(10). "Broadcast television stations continue to be an important source of local news and

public affairs programming and other local broadcast services critical to an informed electorate." § 2(a)(11).

Similar justifications are reflected in the operative provisions of the Act. In determining whether a broadcast station should be eligible for must-carry in a particular market, the Federal Communications Commission (FCC) must "afford particular attention to the value of localism by taking into account such factors as . . . whether any other [eligible station] provides news coverage of issues of concern to such community or provides carriage or coverage of sporting and other events of interest to the community." § 4, 47 U. S. C. § 534(h)(1)(C)(ii) (1988 ed., Supp. IV). In determining whether a low-power station is eligible for must-carry, the FCC must ask whether the station "would address local news and informational needs which are not being adequately served by full power television broadcast stations." § 4, 47 U. S. C. § 534(h)(2)(B) (1988 ed., Supp. IV). Moreover, the Act distinguishes between commercial television stations and noncommercial educational television stations, giving special benefits to the latter. Compare § 4 with § 5. These provisions may all be technically severable from the statute, but they are still strong evidence of the statute's justifications.

Preferences for diversity of viewpoints, for localism, for educational programming, and for news and public affairs all make reference to content. They may not reflect hostility to particular points of view, or a desire to suppress certain subjects because they are controversial or offensive. They may be quite benignly motivated. But benign motivation, we have consistently held, is not enough to avoid the need for strict scrutiny of content-based justifications. *Simon & Schuster, Inc.* v. *Members of N. Y. State Crime Victims Bd.*, 502 U. S. 105, 117 (1991); *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 228 (1987). The First Amendment does more than just bar government from intentionally suppressing speech of which it disapproves. It also generally

prohibits the government from excepting certain kinds of speech from regulation because it thinks the speech is especially valuable. See, *e. g., id.*, at 231–232; *Regan* v. *Time, Inc.*, 468 U. S. 641, 648–649 (1984); *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 514–515 (1981) (plurality opinion); *Carey* v. *Brown*, 447 U. S. 455, 466–468 (1980); *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 96 (1972); *Cox* v. *Louisiana*, 379 U. S. 536, 581 (1965) (Black, J., concurring); see also *R. A. V.* v. *St. Paul*, 505 U. S. 377, 386 (1992) ("The government may not regulate [speech] based on hostility—or favoritism—towards the underlying message expressed").

This is why the Court is mistaken in concluding that the interest in diversity—in "access to a multiplicity" of "diverse and antagonistic sources," *ante*, at 663 (internal quotation marks omitted)—is content neutral. Indeed, the interest is not "related to the *suppression* of free expression," *ante*, at 662 (emphasis added and internal quotation marks omitted), but that is not enough for content neutrality. The interest in giving a tax break to religious, sports, or professional magazines, see *Arkansas Writers' Project, supra*, is not related to the suppression of speech; the interest in giving labor picketers an exemption from a general picketing ban, see *Carey* and *Mosley, supra*, is not related to the suppression of speech. But they are both related to the *content* of speech—to its communicative impact. The interest in ensuring access to a multiplicity of diverse and antagonistic sources of information, no matter how praiseworthy, is directly tied to the content of what the speakers will likely say.

## B

The Court dismisses the findings quoted above by speculating that they do not reveal a preference for certain kinds of content; rather, the Court suggests, the findings show "nothing more than the recognition that the services provided by broadcast television have some intrinsic value and, thus, are worth preserving against the threats posed by

cable." *Ante,* at 648. I cannot agree. It is rare enough that Congress states, in the body of the statute itself, the findings underlying its decision. When it does, it is fair to assume that those findings reflect the basis for the legislative decision, especially when the thrust of the findings is further reflected in the rest of the statute. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 534–535 (1993) (relying on recitals in a city council resolution as evidence of the justifications for an ordinance).

Moreover, it does not seem likely that Congress would make extensive findings merely to show that broadcast television is valuable. The controversial judgment at the heart of the statute is not that broadcast television has some value—obviously it does—but that broadcasters should be preferred over cable programmers. The best explanation for the findings, it seems to me, is that they represent Congress' reasons for adopting this preference; and, according to the findings, these reasons rest in part on the content of broadcasters' speech. To say in the face of the findings that the must-carry rules "impose burdens and confer benefits without reference to the content of speech," *ante,* at 643, cannot be correct, especially in light of the care with which we must normally approach speaker-based restrictions. See *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue,* 460 U. S. 575 (1983).

It may well be that Congress also had other, content-neutral, purposes in mind when enacting the statute. But we have never held that the presence of a permissible justification lessens the impropriety of relying in part on an impermissible justification. In fact, we have often struck down statutes as being impermissibly content based even though their primary purpose was indubitably content neutral. See *Arkansas Writers' Project, Inc., supra* (striking down content-based exemptions in a general revenue measure); *Regan* v. *Time, Inc., supra* (striking down content-based exemptions in a general anticounterfeiting statute);

*Metromedia, Inc.* v. *San Diego, supra* (plurality opinion) (striking down on content discrimination grounds a general urban beautification ordinance); *Carey* v. *Brown, supra,* at 466–468 (striking down on content discrimination grounds an ordinance aimed at preserving residential privacy). Of course, the mere possibility that a statute might be justified with reference to content is not enough to make the statute content based, and neither is evidence that some legislators voted for the statute for content-based reasons. But when a content-based justification appears on the statute's face, we cannot ignore it because another, content-neutral justification is present.

## C

Content-based speech restrictions are generally unconstitutional unless they are narrowly tailored to a compelling state interest. *Boos* v. *Barry,* 485 U. S. 312, 321 (1988). This is an exacting test. It is not enough that the goals of the law be legitimate, or reasonable, or even praiseworthy. There must be some pressing public necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve the goal.

The interest in localism, either in the dissemination of opinions held by the listeners' neighbors or in the reporting of events that have to do with the local community, cannot be described as "compelling" for the purposes of the compelling state interest test. It is a legitimate interest, perhaps even an important one—certainly the government can foster it by, for instance, providing subsidies from the public fisc—but it does not rise to the level necessary to justify content-based speech restrictions. It is for private speakers and listeners, not for the government, to decide what fraction of their news and entertainment ought to be of a local character and what fraction ought to be of a national (or international) one. And the same is true of the interest in diversity of viewpoints: While the government may subsidize speakers that it thinks provide novel points of view, it may not restrict

other speakers on the theory that what they say is more conventional. Cf. *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547, 612–613 (1990) (O'CONNOR, J., dissenting); *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.*, 475 U. S. 1, 20 (1986) (plurality opinion).

The interests in public affairs programming and educational programming seem somewhat weightier, though it is a difficult question whether they are compelling enough to justify restricting other sorts of speech. We have never held that the Government could impose educational content requirements on, say, newsstands, bookstores, or movie theaters; and it is not clear that such requirements would in any event appreciably further the goals of public education.

But even assuming, *arguendo*, that the Government could set some channels aside for educational or news programming, the Act is insufficiently tailored to this goal. To benefit the educational broadcasters, the Act burdens more than just the cable entertainment programmers. It equally burdens CNN, C–SPAN, the Discovery Channel, the New Inspirational Network, and other channels with as much claim as PBS to being educational or related to public affairs.

Even if the Government can restrict entertainment in order to benefit supposedly more valuable speech, I do not think the restriction can extend to other speech that is as valuable as the speech being benefited. In the rare circumstances where the government may draw content-based distinctions to serve its goals, the restrictions must serve the goals a good deal more precisely than this. See *Arkansas Writers' Project, Inc.*, 481 U. S., at 231–232; *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 214–215 (1975).

Finally, my conclusion that the must-carry rules are content based leads me to conclude that they are an impermissible restraint on the cable operators' editorial discretion as well as on the cable programmers' speech. For reasons related to the content of speech, the rules restrict the ability of cable operators to put on the programming they prefer,

and require them to include programming they would rather avoid. This, it seems to me, puts this case squarely within the rule of *Pacific Gas & Elec. Co.*, 475 U. S., at 14–15 (plurality opinion); *id.*, at 23–24 (Marshall, J., concurring in judgment); see also *Miami Herald Publishing Co. v. Tornillo*, 418 U. S. 241, 257–258 (1974).

## II

Even if I am mistaken about the must-carry provisions being content based, however, in my view they fail content-neutral scrutiny as well. Assuming, *arguendo*, that the provisions are justified with reference to the content-neutral interests in fair competition and preservation of free television, they nonetheless restrict too much speech that does not implicate these interests.

Sometimes, a cable system's choice to carry a cable programmer rather than a broadcaster may be motivated by anticompetitive impulses, or might lead to the broadcaster going out of business. See *ante*, at 661–668. That some speech within a broad category causes harm, however, does not justify restricting the whole category. If Congress wants to protect those stations that are in danger of going out of business, or bar cable operators from preferring programmers in which the operators have an ownership stake, it may do that. But it may not, in the course of advancing these interests, restrict cable operators and programmers in circumstances where neither of these interests is threatened.

"A regulation is not 'narrowly tailored'—even under the more lenient [standard applicable to content-neutral restrictions]—where . . . a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals." *Simon & Schuster*, 502 U. S., at 122, n. (internal quotation marks omitted). If the government wants to avoid littering, it may ban littering, but it may not ban all leafleting. *Schneider* v. *State (Town of Irvington)*, 308 U. S. 147 (1939). If the government wants to avoid fraudulent po-

litical fundraising, it may bar the fraud, but it may not in the process prohibit legitimate fundraising. *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620 (1980); see also *Edenfield* v. *Fane,* 507 U. S. 761, 776–777 (1993). If the government wants to protect householders from unwanted solicitors, it may enforce "No Soliciting" signs that the householders put up, but it may not cut off access to homes whose residents are willing to hear what the solicitors have to say. *Martin* v. *City of Struthers,* 319 U. S. 141 (1943). "Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone . . . ." *NAACP* v. *Button,* 371 U. S. 415, 438 (1963) (citations omitted).

The must-carry provisions are fatally overbroad, even under a content-neutral analysis: They disadvantage cable programmers even if the operator has no anticompetitive motives, and even if the broadcaster that would have to be dropped to make room for the cable programmer would survive without cable access. None of the factfinding that the District Court is asked to do on remand will change this. The Court does not suggest that either the antitrust interest or the loss of free television interest are implicated in all, or even most, of the situations in which must-carry makes a difference. Perhaps on remand the District Court will find out just how many broadcasters will be jeopardized, but the remedy for this jeopardy will remain the same: Protect those broadcasters that are put in danger of bankruptcy, without unnecessarily restricting cable programmers in markets where free broadcasting will thrive in any event.

## III

Having said all this, it is important to acknowledge one basic fact: The question is not whether there will be control over who gets to speak over cable—the question is who will have this control. Under the FCC's view, the answer is Congress, acting within relatively broad limits. Under my

view, the answer is the cable operator. Most of the time, the cable operator's decision will be largely dictated by the preferences of the viewers; but because many cable operators are indeed monopolists, the viewers' preferences will not always prevail. Our recognition that cable operators are speakers is bottomed in large part on the very fact that the cable operator has editorial discretion. *Ante*, at 636–637.

I have no doubt that there is danger in having a single cable operator decide what millions of subscribers can or cannot watch. And I have no doubt that Congress can act to relieve this danger. In other provisions of the Act, Congress has already taken steps to foster competition among cable systems. § 3(a), 47 U. S. C. § 543(a)(2) (1988 ed., Supp. IV). Congress can encourage the creation of new media, such as inexpensive satellite broadcasting, or fiber-optic networks with virtually unlimited channels, or even simple devices that would let people easily switch from cable to over-the-air broadcasting. And of course Congress can subsidize broadcasters that it thinks provide especially valuable programming.

Congress may also be able to act in more mandatory ways. If Congress finds that cable operators are leaving some channels empty—perhaps for ease of future expansion—it can compel the operators to make the free channels available to programmers who otherwise would not get carriage. See *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 88 (1980) (upholding a compelled access scheme because it did not burden others' speech). Congress might also conceivably obligate cable operators to act as common carriers for some of their channels, with those channels being open to all through some sort of lottery system or time-sharing arrangement. Setting aside any possible Takings Clause issues, it stands to reason that if Congress may demand that telephone companies operate as common carriers, it can ask the same of cable companies; such an approach would not suffer from the defect of preferring one speaker to another.

But the First Amendment as we understand it today rests on the premise that it is government power, rather than private power, that is the main threat to free expression; and as a consequence, the Amendment imposes substantial limitations on the Government even when it is trying to serve concededly praiseworthy goals. Perhaps Congress can to some extent restrict, even in a content-based manner, the speech of cable operators and cable programmers. But it must do so in compliance with the constitutional requirements, requirements that were not complied with here. Accordingly, I would reverse the judgment below.

JUSTICE GINSBURG, concurring in part and dissenting in part.

Substantially for the reasons stated by Circuit Judge Williams in his opinion dissenting from the three-judge District Court's judgment, 819 F. Supp. 32, 57 (DC 1993), I conclude that Congress' "must-carry" regime, which requires cable operators to set aside just over one-third of their channels for local broadcast stations, reflects an unwarranted content-based preference and hypothesizes a risk to local stations that remains imaginary. I therefore concur in Parts I, II–A, and II–B of the Court's opinion, and join JUSTICE O'CONNOR's opinion concurring in part and dissenting in part.

The "must-carry" rules Congress has ordered do not differentiate on the basis of "viewpoint," and therefore do not fall in the category of speech regulation that Government must avoid most assiduously. See *R. A. V.* v. *St. Paul*, 505 U. S. 377, 430 (1992) (STEVENS, J., concurring in judgment) ("[W]e have implicitly distinguished between restrictions on expression based on *subject matter* and restrictions based on *viewpoint*, indicating that the latter are particularly pernicious."). The rules, however, do reflect a content preference, and on that account demand close scrutiny.

The Court has identified as Congress' "overriding objective in enacting must-carry," the preservation of over-the-air

television service for those unwilling or unable to subscribe to cable, and has remanded the case for further airing centered on that allegedly overriding, content-neutral purpose. *Ante*, at 646–648, 666–668. But an intertwined or even discrete content-neutral justification does not render speculative, or reduce to harmless surplus, Congress' evident plan to advance local programming. See *ante*, at 676–677, 679–680 (O'CONNOR, J., concurring in part and dissenting in part).

As Circuit Judge Williams stated:

> "Congress rested its decision to promote [local broadcast] stations in part, but quite explicitly, on a finding about their content—that they were 'an important source of local news and public affairs programming and other local broadcast services critical to an informed electorate.'" 819 F. Supp., at 58, quoting Cable Television Consumer Protection and Competition Act of 1992, § 2(a)(11).

Moreover, as Judge Williams persuasively explained, "[the] facts do not support an inference that over-the-air TV is at risk," 819 F. Supp., at 63, see *id.*, at 62–65; "[w]hatever risk there may be in the abstract has completely failed to materialize." *Id.*, at 63. "The paucity of evidence indicating that broadcast television is in jeopardy," see *ante*, at 667, if it persists on remand, should impel an ultimate judgment for the appellants.