163 F.3d 137
 14 Communications Reg. (P&F) 701
 WLNY-TV, INC., WRNN-TV Associates Limited Partnership and
Paxson New York License, Inc., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Time Warner Cable of New York City, Time Warner
Entertainment-Advance/New House Partnership, Comcast
Cablevision, Service Electric Cable TV of New Jersey and
Cablevision Systems Corporation, Intervenors.
 Nos. 97-4243, 97-4245 and 97-4265.
 United States Court of Appeals,
Second Circuit.
 Argued May 14, 1998.
Decided Dec. 21, 1998.
 
 Daniel E. Troy, Washington, DC (Fred F. Fielding, Lawrence W. Secrest, III, Howard M. Radzely, Wiley, Rein & Fielding, Washington, DC), for Paxson New York License, Inc.
 L. Andrew Tollin, Washington, DC (Michael Deuel Sullivan, Robert D. Primosch, Wilkinson, Barker, Knauer & Quinn, LLP, Washington, DC), for WLNY-TV, Inc.
 Lee H. Simowitz, Washington, DC (Ann K. Ford, Mark A. Cymrot, Theodore N. Stern, Baker & Hostetler, LLP, Washington, DC), for WRNN-TV Associates Limited Partnership; all on the joint brief for Petitioners.
 Joel Marcus, Washington, DC (Christopher J. Wright, General Counsel, Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, Washington, DC; Joel I. Klein, Assistant Attorney General, Robert B. Nicholson, Robert J. Wiggers, Attorneys, U.S. Department of Justice, Washington, DC, of counsel), for Respondents.
 Henk Brands, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC; Arthur H. Harding, R. Bruce Beckner, Jill Kleppe McClelland, Debra A. McGuire, Fleischman and Walsh, L.L.P., Washington, DC, for Time Warner Cable of New York and Time Warner Entertainment-Advance/Newhouse Partnership; Frank W. Lloyd, III, Christopher A. Holt, Gregory R. Firehock, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Washington, DC, for Cablevision Systems Corporation; Steven J. Horvitz, Robert N. Walton, Cole, Raywid & Braverman, L.L.P., Washington, DC, for Comcast Cablevision, Inc.; Henry A. Solomon, Haley Bader & Potts P.L.C., Arlington, Virginia, for Service Electric Cable TV of New Jersey; all on the joint brief for Intervenors.
 Colby M. May, Washington, DC (Mark N. Troobnick, Law Office of Colby M. May, Washington, DC, of counsel), filed a brief Amici Curiae on behalf of Tri-State Christian TV, Inc. in support of Appellant WLNY-TV, Inc.
 Before: FEINBERG, CARDAMONE, and CABRANES, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 The petitioners-appellants (petitioners) on this appeal are the owners and operators of broadcast television stations in the greater New York metropolitan area. They are WLNY-TV, Inc., WRNN-TV Associates Limited Partnership, and Paxson New York License, Inc. (Paxson). Respondents are the Federal Communications Commission (FCC or agency) and the United States of America. The intervenors on appeal are all cable television companies: Time Warner Cable of New York City, Time Warner Entertainment-Advance/Newhouse Partnership, Comcast Cablevision, Inc., Service Electric Cable TV of New Jersey, and Cablevision Systems Corporation.
 
 
 2
 The intervenor cable television companies petitioned the FCC Cable Services Bureau (Bureau) to lift the requirement imposed on them to carry the signal of petitioners' local commercial broadcast television stations. Intervenors succeeded. Petitioners then moved for reconsideration of the Bureau's order before the FCC. The motions for reconsideration were, with several minor exceptions, denied and the FCC adopted by order dated August 11, 1997 the Bureau's order. From this disposition, petitioners have appealed asserting that the FCC misconstrued the purpose of the Cable Television Consumer Protection and Competition Act of 1992 (1992 Cable Act or Act) and denied rights granted them under that Act to have their signals carried by the cable television intervenors. We set out some brief background so that the issue before us can be seen in proper context.
 
 BACKGROUND
 
 3
 Long gone are the days when American viewers huddled around the family black-and-white TV set equipped with only an antenna to watch Jackie Gleason and Art Carney in "The Honeymooners." Today the television broadcasting industry is dominated by cable service, and numerous channel packages are available to 64.2 million cable subscribers--over 68 percent of television households in America. See Annual Assessment of the Status of Competition in Markets for the Delivery of Video Programming, 13 F.C.C.R. 1034, 1049-50 (1998) (statistics as of June 1997). Only 23 percent of television households currently receive programming entirely through over-the-air broadcast reception. See id. at 1042.
 
 
 4
 Because of cable service's tremendous growth, Congress became concerned over the future of local television broadcast stations that are excluded from cable carriage. Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 117 S.Ct. 1174, 1187, 137 L.Ed.2d 369 (1997). For when a household subscribes to cable service, it does not usually maintain an antenna to receive over-the-air signals from noncable stations, and even those households that do keep an antenna rarely switch from cable to the antenna. See id. at ----, 117 S.Ct. at 1201. The reduced viewership of noncable stations makes them less attractive to advertisers that provide the greatest source of their revenues. See id. at ----, 117 S.Ct. at 1191; 1992 Cable Act, Pub.L. No. 102-385 § 2(14), 106 Stat. 1460, 1462 (1992), reprinted in 47 U.S.C. § 521, Congressional Findings and Policy for Pub.L. No. 102-385 (1994). The feared end result is the eventual extinction of these smaller stations as outlets for local programming. Turner, at ----, 117 S.Ct. at 1187.
 
 
 5
 To avoid such a result, Congress passed the 1992 Cable Act. Reviewing its constitutionality, the Supreme Court noted, "Congress sought to preserve the existing structure of the Nation's broadcast television medium while permitting the concomitant expansion and development of cable television, and, in particular, to ensure that broadcast television remains available as a source of video programming for those without cable." Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 652, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). To accomplish that purpose, the statute requires cable operators to carry the signal of local commercial broadcast stations and local noncommercial educational stations. See generally 47 U.S.C. §§ 534, 535 (1994). At the same time, Congress prescribed circumstances when a cable operator may be excused from its obligation to carry the signal of certain stations.
 
 
 6
 This appeal focuses on the question of whether such circumstances exist with respect to petitioners. We are persuaded that the FCC did not misinterpret the 1992 Cable Act or deny petitioners any rights granted them in that statute. Accordingly, we affirm.
 
 
 7
 A. The 1992 Cable Act and New Must-Carry Rights
 
 
 8
 The 1992 Cable Act mandates that "[e]ach cable operator shall carry, on the cable system of that operator, the signals of local commercial television stations ... as provided by this section." 47 U.S.C. § 534(a). A "local commercial television station" is defined to mean "any full power television broadcast station ... licensed and operating on a channel regularly assigned to its community by the Commission that, with respect to a particular cable system, is within the same television market as the cable system." 47 U.S.C. § 534(h)(1)(A). No one disputes that the television stations owned by petitioners fall within this category. Those stations are WLNY-TV, licensed to Riverhead, Long Island; WRNN-TV, licensed to Kingston, New York; and WHAI-TV, licensed to Bridgeport, Connecticut. Thus, they possess must-carry rights entitling them to carriage of their broadcast signal by cable companies located within the "same television market."
 
 
 9
 To determine whether a cable operator and a broadcast station are within the same market, Congress defined in the 1992 Cable Act what constitutes a broadcast station's market. See 47 U.S.C. § 534(h)(1)(C)(i) (1994) (amended Feb. 8, 1996).[1] For purposes of this appeal, all parties agree that petitioners' default market under the definition is the New York Arbitron Area of Dominant Influence (ADI), and that intervenors are within this ADI, which includes parts of Connecticut, New Jersey, Pennsylvania, and New York, including the five boroughs and Long Island. None of the petitioners are located within New York City itself, but instead reside on the fringes or rim of the New York ADI. An ADI is a geographic area defining television markets in the United States based on measured viewing patterns around a centrally located city. Congress also stated in the definition that a broadcast station's market would be its ADI "except that, following a written request, the [FCC] may, with respect to a particular television broadcast station, include additional communities within its television market or exclude communities from such station's television market to better effectuate the purposes of this section." Id.
 
 
 10
 When the FCC receives a request to modify a station's market, the statute instructs that the agency "shall afford particular attention to the value of localism" through the consideration of such factors as:
 
 
 11
 (I) whether the station, or other stations located in the same area, have been historically carried on the cable system or systems within such community;
 
 
 12
 (II) whether the television station provides coverage or other local service to such community;
 
 
 13
 (III) whether any other television station that is eligible to be carried by a cable system in such community in fulfillment of the requirements of this section provides news coverage of issues of concern to such community or provides carriage or coverage of sporting and other events of interest to the community; and
 
 
 14
 (IV) evidence of viewing patterns in cable and noncable households within the areas served by the cable system or systems in such community.
 
 
 15
 47 U.S.C. § 534(h)(1)(C)(ii).
 
 
 16
 Congress enacted the statute including these factors after previous attempts to adopt must-carry regulations by the FCC were held unconstitutionally overbroad. See Quincy Cable TV, Inc. v. FCC, 768 F.2d 1434 (D.C.Cir.1985) (FCC regulations held to violate petitioner cable company's First Amendment rights because the FCC failed to demonstrate a substantial governmental interest and, if the must-carry rules did serve a substantial interest, they were not narrowly tailored to the goal of protecting local broadcasting); Century Communications Corp. v. FCC, 835 F.2d 292 (D.C.Cir.1987) (accord).
 
 B. Prior Proceedings
 
 17
 This case began when the intervenor cable companies filed numerous petitions with the FCC Cable Services Bureau, pursuant to § 534(h)(1)(C)(i), seeking to drop must-carry coverage of petitioners' signals in certain communities within the New York ADI.[2] The details of the Bureau's decisions are contained in a number of orders: In re Clear Cablevision, Inc., 11 F.C.C.R. 22282 (1996); In re Cablevision Sys. Corp., 11 F.C.C.R. 6453 (1996); In re Comcast Cablevision of Monmouth County, 11 F.C.C.R. 4226 (1996); In re Comcast Cablevision of Monmouth County, 11 F.C.C.R. 6440 (1996); In re Comcast Cablevision of Monmouth County, 11 F.C.C.R. 6426 (1996); In re Continental Cablevision of W. New England, 11 F.C.C.R. 6488 (1996); In re Time Warner Entertainment-Advance/Newhouse Partnership, 11 F.C.C.R. 6541 (1996); In re Time Warner New York City Cable Group, 11 F.C.C.R. 6528 (1996); In re Time Warner New York City Cable Group, 12 F.C.C.R. 13094 (1996); In re TKR Cable Co., 11 F.C.C.R. 17121 (1996); In re Service Elec. Cable TV of N.J., 11 F.C.C.R. 22561 (1996).
 
 
 18
 In its decisions, the Bureau applied the four factors set out in § 534(h)(1)(C)(ii) and determined that the first, third and fourth factors weighed against cable coverage for petitioners throughout most of the ADI. Contrary to the argument advanced by the cable companies, the Bureau refused to find that petitioners had no must-carry rights anywhere. Rather, it placed greater emphasis upon the second statutory factor, that asks whether a station provides coverage or other local service to a community. In so doing, the Bureau looked at each station's "Grade B contour," the distance of each station from the communities in question, and the geographic and political boundaries that existed between a station and the remainder of the ADI. The maximum area over which a broadcast television station emits a signal is known as its "Grade B contour." See 47 C.F.R. § 73.683 (1997); see also ACLU v. FCC, 823 F.2d 1554, 1560 n. 8 (D.C.Cir.1987) ("Use of the Grade B contour enables the FCC to predict the 'approximate extent' to which a signal is viewable in the community covered by the contour."). A Grade B contour describes the area in which 50 percent of television sets will receive a viewable signal through an antenna 50 percent of the time. See 47 C.F.R. § 73.684 (1997). The end result was essentially to require carriage in portions of petitioners' Grade B contours, taking into consideration individual facts involving each station, such as geographical and political boundaries and the nature, scope, and longevity of programming.
 
 
 19
 Motions for reconsideration from the broadcast stations and the cable companies were filed and consolidated. The FCC adopted an order on August 11, 1997 in which it affirmed most of the Bureau's conclusions. In re Market Modifications and the N.Y. Area of Dominant Influence, 12 F.C.C.R. 12262, 12266 (1997). In particular, the Bureau's application of the four statutory factors met with approval, as did the Bureau's partial reliance on Grade B contours, mileage considerations and geography to determine the scope of must-carry rights for petitioners. See id. at 12267-68. After making minor modifications to include six cable communities in WHAI-TV's economic market and ten cable communities in WMBC-TV's economic market, see id. at 12271, the FCC denied the petitions for reconsideration in all other respects. See id. at 12272.
 
 
 20
 In its analysis, the FCC addressed what it believed is the scope of the 1992 Cable Act. It rejected the argument advanced by the cable companies that a broadcast station can be denied must-carry coverage entirely if the station has no historic carriage or audience anywhere in the ADI and the cable company carries other stations of local interest. See id. at 12267-68. The FCC held, as the Bureau had, that the four factors are not exclusive, and that other factors may be considered. See id. at 12268. Turning to the arguments raised by the broadcast stations, it refused to adopt them and ruled the broadcast stations are not necessarily guaranteed the right to cable carriage throughout their ADI. See id. In reaching that conclusion, the FCC pointed to language in the legislative history which acknowledged that it has the power to exclude communities from a station's market, and reasoned that geographic barriers and distance factors were entirely appropriate considerations when trying to define that market. See id.
 
 
 21
 Finally, the FCC found no basis for Paxson's position that exclusion of a community should occur only when a cable company needs the channel capacity to carry the signal of a station in a neighboring ADI that provides more local service. See id. at 12269. Instead, the agency read the statute to mean that Congress delegated authority to make whatever exclusions were necessary to ensure a broadcast station is carried on cable in only those areas serviced by the station and which form the station's economic market. See id. With this much factual background, we pass now to a discussion of the law.
 
 DISCUSSION
 A. Standard of Review
 
 22
 We review the FCC's interpretation and application of the statute under the standard articulated in Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under that standard, if Congress has "directly spoken to the precise question at issue" and "congressional intent is clear," we "must give effect to the unambiguously expressed intent of Congress." Fulani v. FCC, 49 F.3d 904, 910 (2d Cir.1995) (quoting Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778). This is the so-called "first step"--and in some cases the only "step"--of the Chevron analysis. On the other hand, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. The FCC urges that we apply the "reasonable basis" standard applied to agency rulings on mixed questions of fact and law. Fulani, 49 F.3d at 912.
 
 
 23
 Although we believe the Chevron test is the appropriate standard of review under the circumstances presented here, we note that the standard of review advocated by the FCC would likely generate the same outcome as the Chevron test. Under the "reasonable basis" standard, the agency's judgement is entitled to deference. See Fulani, 49 F.3d at 912. While we will not present a detailed analysis of the FCC's decision under this standard, our review of the statute and the orders of the FCC and its Cable Services Bureau suggests that there is a reasonable basis in the record for the FCC's decision. The FCC and the Cable Services Bureau, experts in the area of regulation of the television industry, carefully and properly analyzed the particular facts of the various petitions under the four factors listed in the statute and under non-statutory factors.
 
 B. The Statute and Congressional Intent
 
 24
 In this case, an examination of the language and purpose of the statute reveals a clear congressional intent. Cable systems must carry local commercial television stations in their markets. See 47 U.S.C. § 534(a) and (h)(1)(A). A broadcasting station's market is the ADI in which it is located, but the FCC may modify markets on a case-by-case basis, paying "particular attention to the value of localism," to "better effectuate the purposes of this section" through application of factors such as the four listed in subsection (h)(1)(C)(ii). See 47 U.S.C. § 534(h)(1)(C). These provisions of the statute, which are reproduced in full above, are relatively straight-forward. However, we must examine the statute as a whole to determine what Congress meant by "the value of localism" and "the purposes of this section."
 
 
 25
 When Congress passed the 1992 Cable Act, lawmakers included a series of findings and policies that resulted from their three years of studying the television and cable industry. These "unusually detailed statutory findings," Turner, 512 U.S. at 646, 114 S.Ct. 2445 (analyzing the 1992 Cable Act), provide unique insight into what Congress hoped to achieve when it afforded statutory must-carry cable rights to broadcast stations like petitioners. See Dole v. United Steelworkers of America, 494 U.S. 26, 36, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) ("Particularly useful [in determining Congressional intent] is the provision detailing Congress' purposes in enacting the statute."). Key among these findings are the following:
 
 
 26
 (1) as the cable industry has become concentrated, new programmers experience a barrier to entry and consumers have access to fewer media voices, see 1992 Cable Act § 2(a)(4);
 
 
 27
 (2) since cable companies favor their affiliated programmers, non-affiliated programmers have greater difficulty seeking carriage on cable systems, see id. § 2(a)(5);
 
 
 28
 (3) a substantial governmental and First Amendment interest exists in promoting a diversity of views, see id. § 2(a)(6);
 
 
 29
 (4) broadcast stations are an important source of local news and public affairs programming, which are critical to an informed electorate, see id. § 2(a)(11);
 
 
 30
 (5) a substantial government interest exists in protecting access to free broadcast television programming, see id. § 2(a)(12); and
 
 
 31
 (6) cable companies have no economic incentive to carry the signal of a broadcast station since doing so would result in greater competition for advertising dollars, and without the imposition of must-carry rights a substantial likelihood exists that broadcast signals will be deleted, repositioned, or never carried, see id. § 2(a)(15).
 
 
 32
 These ideas are adequately summarized, for purposes of this appeal, in the finding where Congress states that "[a] primary objective and benefit of our Nation's system of regulation of television broadcasting is the local origination of programming. There is a substantial governmental interest in ensuring its continuation." Id. § 2(a)(10). When combined with the emphasis on the "value of localism" immediately preceding the statutory factors in § 534(h)(1)(C)(ii), what quite plainly emerges is that for the FCC "to better effectuate the purposes" of the 1992 Cable Act, it must ensure the continuation of the local origination of programming.
 
 
 33
 With respect to what is meant by "localism"--in other words, exactly how far can a broadcast station's signal reach and still be considered local to its market--the statutory factors are designed to assist the FCC in answering this question, while avoiding the imposition of overly broad carriage requirements on cable companies. That they are not meant to be exclusive is evidenced by Congress' immediately preceding use of the phrase "such factors as." When an analysis of those four factors weighs against cable carriage, the FCC may choose others to add to the list, so long as they help ensure the continuation of the local origination of programming, i.e., afford attention to the "value of localism."
 
 
 34
 In so stating however, it must be remembered that the entire series of findings set forth by Congress remains relevant despite our consolidation of them into one thought. For example, Congress states that "[t]here is a substantial governmental and First Amendment interest in promoting a diversity of views provided through multiple technology media." Id. at § 2(a)(6). Helping local programming to continue is the means by which the FCC protects this interest.
 
 
 35
 Legislative history, sometimes used by courts in the first step of a Chevron analysis to determine Congress' intent,[3] see, e.g., Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 649, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), generally reinforces Congress' expressed purpose in this case. The report of the Committee on Energy and Commerce of the House of Representatives (House Committee), submitted in support of the bill that became the 1992 Cable Act, is a good indicator of Congress' intent. See Pierpoint v. Barnes, 94 F.3d 813, 817 (2d Cir.1996), cert. denied, 520 U.S. 1209, 117 S.Ct. 1691, 137 L.Ed.2d 818 (1997) ("A committee report, representing a collective statement by the drafters about the intended purpose of proposed legislation, is considered a particularly good indicator of congressional intent when it is otherwise difficult to ascertain."). We look to the House Committee report because the language defining the market for a commercial broadcast station originated in the House. The House Committee "believe[d] that ADI lines are the most widely accepted definition of a television market and more accurately delineate the area in which a station provides local service than any arbitrary mileage-based definition." H.R.Rep. No. 102-628, at 97 (1992).
 
 
 36
 However, the Committee "recognize[d] that since ADIs are drawn along county lines, they may, in some instances, inaccurately reflect the stations which are local to a particular community." Id. While "in most instances a station's ADI is consistent with the area where such station provides local service," the Committee concluded "that a station's ADI may be so far removed from the station that it cannot be deemed part of the station's market." Id. To prevent abuse of the exclusion rules, the Committee specified that "[u]nless a cable system can point to particularized evidence that its community is not part of one station's market, it should not be permitted to single out individual stations serving the same area and request that the cable system's community be deleted from the station's television market." Id. Moreover, the legislators emphasized "[i]t is not the Committee's intention that these provisions be used by cable systems to manipulate their carriage obligations to avoid compliance with the objectives of this section." Id. at 97-98. The legislative history thus reinforces the clear terms of the statute in stating that there is a presumption that local commercial broadcast stations will be carried throughout the ADIs in which they are located but that the FCC may modify a station's market when presented with particularized evidence that the ADI does not accurately describe that station's market.
 
 C. The FCC's Order
 
 37
 Discussion passes, in light of Congress' expressed aim, to an analysis of the FCC's actions in this case. The FCC first applied each statutory factor, finding that factors 1, 3, and 4 did not support cable carriage for petitioners in the communities at issue. So as to give effect to Congress' expressed design to preserve local programming, the agency focused on factor 2 and employed Grade B contours, mileage and geographical considerations to determine how far each station's market extended.
 
 
 38
 These considerations are particularly relevant to the New York ADI. As many of the FCC Cable Services Bureau's decisions point out, the New York ADI is unusually large in terms of geography and populations. See, e.g., In re Clear Cablevision Inc., 11 F.C.C.R. at 22290-91; In re Cablevision Sys. Corp., 11 F.C.C.R. at 6472. Because the New York ADI is the largest in the country, it contains geographies and demographics unlike the typical ADI. For example, it consists of 6,749,500 television households--meaning that even when a large percentage of the ADI is removed from a station's must-carry coverage, as it was in the case of WRNN-TV (78 percent) and WHAI-TV (89 percent)--that station is still able to reach hundreds of thousands of households. Moreover, the New York ADI is significantly more populous than the second-ranked Los Angeles ADI--exceeding it by almost 2 million television households.
 
 
 39
 With respect to its geographic make-up, not only does the New York ADI span four states, but the counties within this area are not contained in one contiguous land mass. Rather, they are separated by several bodies of water, including the Hudson River and Long Island Sound. New York City acts as a natural boundary because its complicated and congested traffic patterns make it difficult for residents at one end of the ADI to access communities at the other end. The ADI therefore has an obvious tendency to break itself up into smaller divisions reflecting localized regions. New York City serves as the "hub," with its stations' programming and advertising being of widespread interest across the ADI. Outlying communities are the "spokes," with their stations generally showing programming and advertising of interest only to viewers in relatively close proximity to that community.
 
 
 40
 The FCC's order is an appropriate application of the statute. It analyzes each of the four factors for evaluating exclusion requests listed in the statute and recounts the FCC Cable Services Bureau's determination that the stations "generally had no history of carriage in the cable communities in question [factor 1]," that they had "virtually no over-the-air audience in the cable communities at issue [factor 4]," and "that other area stations provide subscribers residing in the cable communities with an abundance of targeted local newscasts and public affairs programming [factor 3]." In re Market Modifications, 12 F.C.C.R. at 12267. According to the FCC, "the Bureau recognized the difficulties of applying the four statutory factors to stations of recent origin ... or more specialized formats." If a "decision were based on these specific statutory criteria alone [factors 1, 3, and 4], the stations at issue would have virtually no market at all to assert their signal carriage rights because they fail to satisfy each of the factors throughout the New York ADI." Id. at 12268.
 
 
 41
 Instead of limiting itself to the four factors, the Bureau "properly interpreted the statute's legislative history indicating that the four enumerated factors are not intended to be exclusive in determining a particular station's television market." Id. The Bureau "relied more heavily on basic geographic and political features and recognized marketing facts as the best alternative evidence of the market boundaries of the stations subject to deletion here." Id. The FCC order at issue here emphasizes the Bureau's use of Grade B contours in constructing the station's markets. Id. at 12268-71. However, the Bureau's decisions are based on other factors as well. For example, the Bureau's decision on WHAI's market on Long Island states that "while WHAI-TV provides Grade B service to some of the Long Island communities named in the petition, the intervention of the Long Island sound between these communities and the Bridgeport situs of the station appears to be a logical boundary to its market area and validates the absence of audience and historic carriage as appropriate market defining evidence." In re Cablevision Sys. Corp., 11 F.C.C.R. at 6478. In addition, the Bureau took into consideration the "New York Interconnect" sub-zones, advertising zones created by the cable operators in the New York ADI for local advertisers. See id. at 6479-80; see also In re Market Modifications, 12 F.C.C.R. at 12268; In re Clear Cablevision Inc., 11 F.C.C.R. at 22291. In sum, the FCC, in adopting most of the findings and conclusions of its Cable Services Bureau, properly applied the statute by considering the four factors in the statute as well as others not enumerated in order to preserve local programming.
 
 
 42
 From the above analysis, we think the following rule has thus been distilled: in the normal course, the ADI presumption applies. When broadcast stations are located at the "hub" of an ADI, they will ordinarily have no problem satisfying the four factors listed in the statute, and will be able to repel requests for exclusion. Accordingly, in most cases, the ADI lines will more accurately delineate the area in which a station provides local service than will any arbitrary mileage-based definition.
 
 
 43
 However, when "spoke" or "rim" broadcast stations, located at the edge of an ADI, are targeted for exclusion proceedings, a strict application of the four statutory factors might indicate that widespread exclusion is in order. Inasmuch as the New York ADI is the largest ADI in the country, it is not surprising that it presents a paradigmatic "rim" case. But, because the statutory factors are illustrative rather than exclusive, the FCC does not controvert Congress' plan--continuing the local origination of programming--when it considers the Grade B contour, the station's distance from the community, and geographical and political boundaries as additional factors in order to prevent widespread exclusion.
 
 
 44
 Accordingly, in general, the FCC should (1) observe the presumption that a broadcast station's market is the ADI in which it is located; (2) consider the four statutory factors in an exclusion proceeding to evaluate particularized evidence of local origination of programming; and (3) if the four factors alone would trigger widespread exclusion, consider Grade B contours, distance, geographical and political boundaries, and other unenumerated factors to limit the scope of the exclusion.
 
 
 45
 We hold that this approach--used by the FCC in this case--is in accord with the plain language of the statute, with the purposes of the legislation articulated in the "findings" section of the Act, and with the legislative history, and that it duly respects the value of localism.CONCLUSION
 
 
 46
 Having considered petitioners' remaining arguments and finding them to be without merit, we affirm the order.
 
 
 
 [1]
 The amended statute is not pertinent to this appeal. In conceding what would be petitioners' market as defined by statute, every party relied upon the 1994 version of the official United States Code
 
 
 [2]
 Intervenors also filed petitions affecting WTBY-TV in Poughkeepsie, New York and WMBC-TV of Newton, New Jersey, neither of which are parties to this appeal
 
 
 [3]
 We note that precedent is inconsistent regarding whether legislative history is more appropriate in a Chevron Step I or Step II analysis. We need not now resolve this difficult question. The history underlying the Act simply provides further illumination of Congress' scheme, clearly expressed in the language and design of the statute which have just been analyzed